### JACKSON, ex dem. Varick, *vs.* WALDRON and wife.

Where a *testator* devised one portion of his real estate to a son named *Joseph,* and another portion to another son named *Medcef,* and ordered, if either of his sons should die without lawful issue, that his share or part should go to the *survivor,* IT WAS HELD, that the right of *Medcef* in the share devised to *Joseph,* during the lifetime of Joseph, was a *mere naked posibility,* and was not *assignable* or *releasable.*

And where the two sons, Joseph and Medcef, during the lifetime of Joseph, united in *assigning* a mortgage covering premises devised to Joseph, which mortgage had been obtained by their father by assignment 21 years previous to the transfer thereof by Joseph and Medcef, and the mortgage monies secured thereby were payable *thirty-five years* previous to such last assignment, and the assignment did not contain any allegation or covenant that the mortgage was a *valid and subsisting encumbrance,* IT WAS HELD, that the devisees of Medcef, who survived Joseph, were not *estopped,* in an action of ejectment brought for the recovery of the premises, founded upon such last assignment, from showing that the father of Joseph and Medcef was the owner, or that he was in possession and claimed to be the owner of the premises covered by the mortgage at the time of the assignment to him, and consequently that the mortgage was not a valid line at the time of the assignment, but was merged or extinguished in the fee.

The principle of an *estoppel,* as applicable to deeds, is to prevent *circuity of action,* and to compel parties to fulfil their contracts: thus a party asserting in a deed the existence of a particular fact, and thereby inducing another to contract with him, cannot by a denial of that fact compel the other party to seek redress against his bad faith by suit; but the court will decide upon the rights of the parties, without subjecting them to the expense and delay of a new litigation—and this they will do, not on the ground of *concluding the party from showing the truth,* but because the whole truth being shown, the justice of the case is not changed.

The order of proof of a *sealed instrument,* to which there is a *subscribing witness,* is as follows: 1. The witness must be produced, if practicable; 2. If he cannot be found, or his testimony cannot be used, *his hand-writing* must be proved; 3. If his hand-writing cannot be proved, after diligent exertions for that purpose, proof of *the hand-writing of the party* executing the instrument is admissible.

But evidence that a subscribing witness cannot be found, will not warrant the inference that his *hand-writing cannot be proved ;* the party seeking to avail himself of such testimony must show due diligence to obtain as well proof of the hand-writing as the attendance of the witness.

*It seems,* where a sealed instrument is proved by showing the hand-writing of the witness. that it is proper to superadd proof of the hand-writing of the party. Per Chancellor WALWORTH and Senator TRACY.

ALBANY, Dec. 1834.

Jackson v. Waldron.

ERROR from the supreme court. In December, 1828, *Richard Varick* commenced an action of ejectment in the superior court of the city of New York, in the name of *James Jackson,* as *nominal* plaintiff, according to the then practice in the action of ejectment, against *Rachel Eden,* for the recovery of a house and lot of ground in the city of New York. The plaintiff had a verdict. The defendant sued out a writ of error on a bill of exceptions, removing the record into the *supreme court,* to which a return was duly made ; but the defendant dying soon thereafter, *John Pelletreau,* who claimed to be entitled to an interest in the premises, sued out a new writ of error, and upon his assignment of errors and the joinder thereto, the cause was brought to argument in the supreme court ; which court reversed the judgment of the superior court, rendered upon the verdict obtained by the plaintiff. Since which reversal *Pelletreau* has died, and the plaintiff now sues out a writ of error against the present defendants in error, who claim to be the *owners* of the premises in question.

On the trial of the superior court, the plaintiff claimed to recover the premises upon the following state of facts : On the 17th October, 1767, the premises in question were conveyed in fee to one *John Bridgewater,* who, on the 15th August, 1768, executed a mortgage of the same to one *Sheffield Howard,* to secure the payment of £100, with interest, within one year from the date of the mortgage. Bridgewater, left this country on the evacuation of the city of New York by the British troops. On the 25th December, 1783, Howard, for the consideration of £137, 9, 8, assigned the mortgage to *Medcef Eden,* who, on the 29th of August, 1798, made his last will and testament, and shortly thereafter departed this life. By the will, the testator gave the *premises in question* and a number of negro slaves to his son *Joseph ;* and by another clause devised to his son *Medcef* certain oth-

er real estate, adding a clause in these words : " It is my will, and I do so order and appoint, that if either of my said sons should depart this life without lawful issue, his share or part shall go to the survivor." On the 1st September, 1804, *Joseph Eden* and *Medcef Eden*, as executors of the will of their father, *assigned* the mortgage executed by Bridgewater to *Joseph Winter*, transferring to him "the aforesaid indenture of mortgage, and the bond therein mentioned, and all moneys due and to grow due thereon," and which assignment contained the following clause : " And we, the said Martha Eden, Joseph Eden and Medcef Eden, do hereby, for ourselves and our heirs, release and convey unto the said Joseph Winter, his heirs and assigns, all our right, title and interest, of, *in and to the said lot of ground and premises before mentioned, and every part and parcel thereof.*" The consideration expressed in this instrument was $500, and the instrument contained *recitals* setting forth the mortgage, its assignment to Medcef Eden, the devise by him of the premises in question to his son *Joseph*, and the appointment of his wife Martha and his two sons as executors of his will. The instrument appeared to have been executed in the presence of *Eliza Bellamy*, as a witness, who was not produced on the trial ; the plaintiff, however, proved that on dilligent search she could not be found, but no proof was offered that her *hand-writing* could not be proved although one of the witnesses testified that he knew a person named Eliza Bellamy, who formerly resided with the Edens. Upon this proof being given, the judge ruled that evidence of the *hand-writing of Joseph and Medcef Eden* was admissible, and their signatures to the instrument were accordingly proved. To which decision and evidence the defendant excepted. The plaintiff also proved an advertisement of a *statute foreclosure of the mortgage*, but did not show a continuance of the advertisement for a longer period than about *three months;* the *time* of sale mentioned in the advertisement was the 15th March, 1805. Five days after the day of sale, *Winter*, as the assignee of the mortgage, executed a deed of the premises in question, as sold under a foreclosure of the mortgage to *Robert Robinson ;* which deed contains *recitals* of the mortgage executed by Bridgewater, of the assignment thereof to Medcef

Eden, of the last will and testament of Medcef Eden, and of the assignment to Winter; and also setting forth that due proceedings had been had under the statute for the foreclosure of the mortgage. On the day succeeding that on which the premises were conveyed to *Robinson*, he re-conveyed them to Winter, who, on the 1st May, 1805, conveyed them to *S. Boyd*, by deed, with full covenants, for the consideration of $2660. Mr. Boyd, in the same year, built a house on the premises, which cost between $5000 and $6000, and on the 1st May, 1806, sold and conveyed the premises to J. Otis, for the sum of $9000. On the 1st March, 1810, *Varick*, the lessor of the plaintiff, became the purchaser of the premises, deriving title by sundry mesne conveyances from *Otis*, the vendee of *Boyd*. The premises were occupied under Varick from 1815 to 1820, and again from 1824 to 1828.

On the part of the defendant was produced in evidence a record of recovery of the premises in question, in an action of ejectment commenced in this court in 1822, in the name of James Jackson, on the demise of *Rachel Eden* and *John Wood*, against *Richard Varick* and Harriet Bacon; the verdict in which was rendered for the *plaintiff* in that suit, and the *judgment* signed 7th June, 1827; and it was proved that in 1782 or 1783 one Piggot, a school-master, occupied the premises and paid rent to Medcef Eden, who claimed the premises as his own, and they were called his property. Possession was shown to have been continued under him until the time of his death, and the premises were held under title derived from him until 1802. In 1803 the trustees of a church claimed the property, and rent was paid to them by a tenant, who was turned out of possession in 1804 by *Winter*. The defendant also read in evidence *insolvent discharges*, granted to *Joseph Eden* and *Medcef Eden* on the 20th August, 1801, setting forth in each discharge that the insolvent had executed an assignment of all his estates, real and personal, to *John Wood, junior*, an assignee duly appointed, and had complied with all things required by the *act for giving relief in cases of insolvency*, passed 21st March, 1788. It was proved that both *Joseph* and *Medcef Eden* died without issue: the first

in 1813, and the last in 1819.  *Rachel Eden,* the defendant in the cause, it seems, claimed as the *devisee* of Medcef Eden.

The judge charged the jury, that if they believed that the assignment of the mortgage from Bridgewater to Howard had been duly executed by Joseph and Medcef Eden, and that the premises in the possession of the defendant were those described in the mortgage and assignment, (to create doubts respecting which, some evidence had been given,) the plaintiff was entitled to recover ; to which charge the defendant excepted. The jury found for the plaintiff. The defendant applied for a new trial, which was *refused* by the superior court, who held that the *secondary evidence* as to the execution of the assignment, by proof of the *hand-writing* of Joseph and Medcef Eden, had been properly received; that all persons claiming under *Medcef Eden, jr.* were *estopped* from averring that the mortgage was not, at the time of the assignment to Winter, *a valid and subsisting encumbrance,* or that Joseph and Medcef Eden, as executors of their father's will, had not power to make a legal and valid assignment of it ; and that the instrument executed by Joseph and Medcef to Winter, conveyed to the latter the whole estate in the premises, either as passing the contingent interest of Medcef, or by way of estoppel against him or those claiming under him ; and the *superior court* accordingly rendered judgment for the plaintiff, which judgment was *reversed* by the *supreme court,* who held that the *proof of the hand-writing of Joseph and Medcef Eden* to the deed of assignment had been improperly received, inasmuch as it had not been shown that a *bona fide* attempt had been made to obtain *proof of the hand-writing of the subscribing witness.* And they *further held,* that the mortgage, at the time of the assignment, was *not a valid and subsisting encumbrance ;* that Medcef Eden the younger, at the time of the assignment, had a *mere naked possibility of interest,* and not a right *in esse* in the premises, which possibility was not the subject of release ; and that those claiming under *Medcef Eden, jr.* were *not estopped* from setting up the title which devolved upon him on the death of Joseph Eden, or from alleging that the mortgage, by reason of lapse of time, in presumption of law, was paid, or that the only purpose of

the assignment was to pass the mortgage as a muniment of ti-tle during the continuance of the life estate of Joseph. *See the Opinion delivered in the Supreme Court.* 11 *Wendell,* 115. *et. seq.* The cause was argued in this court by

*G. Wood, & B. F. Butler,* for the plaintiff in error.

*H. R. Storrs, & R. Sedgwick,* for the defendants in error.

The following opinions were delivered:

By the CHANCELLOR. In the present case, as in the case of *Varick & Bacon* v. *Jackson,* which was formerly before this court, both parties claim under the will of Medcef Eden, the elder. But the questions now presented are entirely different from those which then arose; not only from the different state of facts then presented, but more especially from the establishment, in the present case, of the important fact that the assignment to Joseph Winter was executed by Medcef Eden, the younger, as well as by Joseph Eden. The first question to be examined, therefore, is as to the legality of the proof by which the execution of the assignment was established.

The law appears to be settled in this state, that if there is a subscribing witness to a sealed instrument, and he is dead or out of the jurisdiction of the court, so that his personal examination cannot be had, proof of his hand-writing is to be received as secondary evidence of the execution of the instrument, in preference to the hand writing of the party by whom such instrument purports to have been executed. Whether this is in fact better evidence than the hand-writing of the party, as to the due execution of an instrument which by law does not require the attestation of a witness, is a question which it is not necessary that I should discuss here. Proof of the hand-writing of both is certainly the best secondary evidence. (a) But although many able judges have declared

---

(a) See *Whitlock* v. *Musgrove,* 1 *Cromp. & Mason,* 511, where the court required proof of the identity of the signer of the note, as well as proof of the hand-writing of the witness, who was out of the jurisdiction of the court.

their dissatisfaction with the rule as established, most of them have considered it too well settled to be altered, except by legislative enactment. But it is equally well settled, that if the subscribing witness is dead, or is a fictitious person, or if upon diligent inquiry he cannot be traced or identified, and no person can be found who is acquainted with his hand-writing, the instrument may be proved by giving in evidence the hand-writing of the party. It is very evident, from the testimony in this case, that the subscribing witness to the assignment could not be found; and from the description given of her, by the only witness that could be found who had ever seen her, there was not the least probability that her hand-writing could have been established, after a lapse of 25 years. Besides, the exceptions in this case did not distinctly present the question now raised, to the notice of the judge who tried the cause, so as to enable the defendant to take advantage thereof on a writ of error. It is evident from the whole case that neither party supposed the witness Merritt knew any thing of the hand-writing of Eliza Bellamy; and if the objection had been made at the trial, that he might be acquainted with her hand-writing, such objection would undoubtedly have been obviated on the spot, by asking the question. The evidence subsequently given in the cause was sufficient to authorize the finding of the jury as to the execution of the assignment by both of the Edens, and that question was properly submitted to the jury. It therefore becomes necessary for me to consider the effect of such assignment upon the rights of these parties, either by way of estoppel or otherwise.

To understand the several questions which arise upon this argument, it is necessary to advert to the situation of the respective parties in reference to the title which Medcef Eden, the elder, had in the premises at the time of his death. A valid paper title is produced to Bridgewater and his wife, who lived upon the premises immediately previous to the evacuation of the city of New-York by the British troops, in November, 1783. This paper title is traced back for more than thirty years previous to that time, so that there can be no reasonable doubt that Bridgewater and wife owned the premises at

the time of the giving the mortgage to Sheffield Howard, in August, 1768 ; and for ought that appears in this case, they continued to be the owners of the equity of redemption in these premises at the time of the assignment of the mortgage to Medcef Eden, in December, 1783.   On the part of the defendants in error, who claim under Medcef Eden the younger, it is insisted, as a matter of fact, that old Medcef Eden was the owner of the premises previous to the assignment of the mortgage to him, in 1783 ; and that by such assignment the mortgage became merged in the equity of redemption which he before possessed, so as to give him an absolute fee in the premises.   On the other hand, it is supposed that Bridgewater and wife were the owners of the equity of redemption, and continued to occupy the premises until the evacuation of New York, in November, 1783, when they went off as refugees, leaving the premises vacant, except a part thereof which was then or shortly afterwards occupied by Piggott, the schoolmaster, as a tenant; and that Eden then purchased in the mortgage, and continued to occupy the premises, by his tenants, under that claim, until his death, fifteen years afterwards.   I think the weight of evidence in the present case is in favor of this last presumption ; and in this respect there is some considerable difference between the evidence in this case and that which was given on the former trial.   But as this was a question proper for the consideration of the jury, if the defendant was not estopped by the assignment from raising the question, I will proceed to examine the other questions which were discussed on the argument.   Rachel Eden, the original defendant, claimed the premises under the will of Medcef Eden the younger.   Pelletreau, who brought the writ of error in the supreme court, also claimed a life estate in the premises in remainder, upon the termination of her estate ; and the present defendants claim the remainder in fee in the premises, as vested in possession upon the death of Pelletreau, who died after the suing out of the writ of error in this court. Whatever, therefore, would operate as an estoppel against Medcef Eden, the younger, will also estop those who are claiming under him.   If the mortgage of Bridgewater and

wife, which was assigned to Eden in 1783, was assigned to Winter in 1804, as a valid and subsisting mortgage upon the premises, the assignors and all the persons claiming under them, or either of them, subsequently to that time, are estopped from setting up any claim or title to the premises which is inconsistent with such assignment ; and of course are not permitted to aver or show that the mortgage had become merged in the fee, either by a release of the equity of redemption to Medcef Eden, the elder, subsequent to the assignment of the mortgage, or by a conveyance from Bridgewater and wife previous to that time, in one of which ways only could the mortgage have been extinguished, as there is no pretence of actual payment, and no presumption of payment can arise from the possession by the assignee of the mortgage, or those claiming under him.   Taking the whole of this assignment together, I think it is evident that both of the assignors intended to convey and assign the mortgage as such, and as a valid and subsisting encumbrance upon the land. It is true the assignment recites a bequest of the premises to Joseph Eden by the will of his father ; but it is not, as supposed by the defendants' counsel, a recital of a devise to him of an absolute fee in the premises. ˙ The recital was perfectly correct and proper, upon the supposition that none of the parties doubted at the time, that the interest of Medcef Eden the elder in the premises was a mere mortgage interest, which he intended by his will to give his son Joseph as a mere specific legacy or bequest ; the beneficial interest in which could not absolutely vest in the legatee, except by the assent of the executors, after payment of all the testator's debts.  It must be borne in mind that, although a mortgage is in equity considered as a mere encumbrance upon the land, yet, by the common law, every legal mortgage included an actual transfer to the mortgagee of the legal interest in the land ; and which legal interest in the land, previous to our revised statutes, was sufficient to enable the mortgagee to maintain an ejectment before foreclosure of the mortgage.   And although the mortgage money belonged to the personal representatives of the mortgagee, upon his death, yet at law the legal estate decends to his heir, or went to his devisee, who held it as a trustee for the benefit of

the personal representatives. In this case, therefore, although the testator had nothing but a mortgage interest in the premises, as the assignee of the Bridgewater mortgage, which mortgage debt went to his personal representatives as a part of his personal estate, yet the legal title which was the pledge for the security of such debt went to the devisees in trust for the benefit of those who were entitled to the mortgage money, *Atkinson's Prac. Points in Conv.* 116, *note ;* and if that legal title has not passed under the assignment to Winter, no ejectment suit can be sustained by those claiming under him, without showing an actual foreclosure of the mortgage. The assignment, therefore, recited the disposition which the testator had made of his interest in these premises by his will; and Joseph and Medcef Eden very properly released and conveyed all their interest as devisees of the legal estate to Winter, to whom they assigned the mortgage debt in their character of executors. There is nothing upon the face of this assignment, therefore, which can operate as a counter estoppel, or from which it can be inferred that the testator intended to pass, by his will, any thing more than the mortgage debt which he held as assignee, and the legal title which passed to him under the assignment from the original mortgagee. The testator undoubtedly had strong reasons to suppose that Bridgewater and wife, who had fled from the country as refugees, upon the evacuation of the city by the British, a few days before he took the assignment from Howard, would never return to redeem the premises ; and that his interest as assignee of the mortgage, might, in time, ripen into an absolute and irredeemable interest in the land itself. There is no evidence in the case, however, to show that Joseph Eden ever entered upon the premises in the character of devisee merely ; or that the executors ever assented to the devise as a specific bequest to him of the mortgage debt ; and by the assignment of the same to Winter as a subsisting mortgage, in their character of executors as well as devisees of the legal interest in the pledge, Joseph and Medcef and all persons claiming under them are estopped from alleging that the testator had an absolute legal estate in the land, which passed beneficially to the devisees; or such an interest as could pass to the assignee under the

insolvent act, admitting such an assignment to have been legally proved in this case. Even if the whole of this transaction was concocted in fraud, for the purpose of defrauding the assignee of Joseph Eden, yet, as no such fraudulent intention appears on the face of the assignment, S. Boyd, who was a *bona fide* purchaser for a full consideration, and without any notice of such fraud, although he might not have been protected against the claim of Wood during the continuance of the life estate of Joseph Eden, is certainly entitled to protection, as such *bona fide* purchaser, against the claims of all the parties to that assignment, who, and all others who claim under them, by any act, deed or devise, subsequent to that assignment, are estopped from disputing the title which the assignment purported to convey. Even if the will of Medcef Eden the elder, which is referred to in this assignment, is to be considered as a part thereof, and as notice, to all who claim through such assignment, of the contents of the will, there is nothing upon the face of the will to show whether the testator considered himself as having an absolute title to the land, or only a mere mortgage interest under the assignment of Howard, as a mortgagee in possession ; which interest was subject to the equity of redemption of the original mortgagors, if they should ever come forward to claim that equity. The clause of the will in which this devise is found contains personal as well as real estate, and the terms used are applicable as well to the interest of a mortgagee in possession as to an absolute fee and to personal estate. The effect of the clause is to convey it to the devisee and his heirs if it is real estate, and to the legatee and his executors if it is to be considered as personal, or a chattel interest in real estate, and without any thing from which it can be ascertained whether the testator considered it either as one kind of property or the other. We must therefore look beyond the assignment and the will to which it refers, or we shall find nothing which can rebut the presumption that, at the time of this assignment, the mortgage of Bridgewater and wife was a valid and subsisting security for the payment of a debt, the beneficial interest in which the assignors had a right to transfer, as the executors of Medcef Eden, the elder ; and the le-

gal presumption is that they joined in the assignment of the land itself, for the purpose of transferring their legal interest in the pledge ; which legal interest had passed to them as devisees, either by the general or special bequests contained in the will.

The doctrine of estoppel was so fully examined upon the argument of this cause by the counsel on both sides, that it is not necessary for me to go into that subject at length. I will therefore proceed to show its applicability to the case under consideration. The whole doctrine rests upon the ground or good faith and fair dealing, not merely as regards the parties to the deed or instrument which is to operate as an estoppel, but also as to *bona fide* purchasers, and others who may have been induced to purchase and part with their money, or who may have relinquished other rights upon the faith of recitals, allegations, and other representations contained in the deed of instrument under which they claim. For this reason the estoppel runs with the land, or the interest therein which such deed or instrument professes to convey, transfer or release, into whose hands soever the same may come, for the protection of interests thus acquired ; and not only the parties to such instrument, but all other persons claiming any interest in the lands to which the estoppel relates, by, from, or under any of the parties to such instrument, are estopped and prohibited from alledging or averring anything which is inconsistent with the instrument itself. Some cases were cited from the decisions of our own courts, to show that a mere quit-claim deed does not operate as an estoppel. This is undoubtedly so ; for a quit-claim deed, upon its face and by its terms, only purports to release and quit-claim whatever interest in the premises the grantor then has. But even in a deed of this description, if the grantor, either by way of recital or otherwise, represents himself as being the owner of the premises, or as having any particular estate or interests therein, or as being entitled to transfer a right or interest in the premises in a particular character, such grantor and any person claiming under him by descent or devise, or by any subsequent conveyance of the premises, will be estopped from alleging or proving the contrary. Applying these principles to the pres-

ent case, I am of the opinion that Medcef Eden the younger, and the defendants who claimed under him, must be held to be estopped from alledging that this mortgage was not a valid and subsisting encumbrance upon the premises, and which the executors had a right to assign as such. The judge who tried the cause was therefore right in not submitting the question, as to the extinguishment of the mortgage, to the jury, as a fact for them to determine by evidence dehors the assignment, as the defendant was estopped from alledging or proving that the mortgage which was thus assigned was not, at the time of such assignment, a valid and subsisting mortgage.

But even if the defendants' counsel are right in supposing that the recitals in this assignment show that Joseph Eden was seized of the premises under the will of his father, as of an absolute and irredeemable estate, subject only to the executory limitation over to Medcef, upon the contingent events which have occurred, another very grave and most important question presents itself for the decision of this court; that is, whether this assignment did not operate so as to pass to Joseph Winter, and through him to the lessor of the plaintiff, the contingent right of Medcef Eden, the younger, under the executory clause of the will. When the cause of *Vakrick & Bacon* v. *Jackson* was before this court, I expressed the opinion that the jury in that case must have decided against the validity of the execution of the assignment by Medcef Eden, the younger, inasmuch as it contained a valid conveyance of all his estate in the premises. That was a question which had not been discussed on the argument of the cause, as it only arose incidentally; and of course I did not stop to inquire whether the interest of Medcef Eden, the younger, was a vested *estate*, or a *vested interest in an estate*, under an executory devise. The opinion I then expressed was based upon the supposition which I believe has been extensively acted upon in this state, that where all the contingent estates or rights in land have actually become vested in interest in the persons in whom they are to vest as estates in possession upon the happening of the contingency, a conveyance in the usual form and upon a sufficient consideration, in which every person having any interest in or encumbrance upon the land

joins as a grantor, will, in one way or another, operate as a valid transfer to the grantee of an absolute and indefeasible estate in the premises. *See* 10 *Coke,* 49, *a.* Although this opinion was expressed by me in that particular case without much consideration, I confess I should very much regret to find myself compelled to adopt the conclusion of the supreme court in this case. That Medcef Eden, the younger, had not such an interest in the premises, under the will of his father, as could be released or assigned during the lifetime of his brother Joseph. The sanctioning of such a principle by this court, I think, must necessarily have the effect to unsettle the titles to a very considerable portion of the real property in this state ; especially in those counties where conveyances by fine and recovery have been seldom adopted. Since the passing of the statute for abolishing entails, the limitation over of estates among children, by way of executory devise, as in this, has been very extensively practiced here ; and I am inclined to think it has been a case of frequent occurrence, that all the devisees interested in the land under such executory limitations, have joined in an ordinary conveyance to a grantee, under a belief that he would thereby become absolutely entitled to the whole estate. In other cases, the owner of a determinable fee has taken from the person contingently entitled to a future estate in the premises, by way of executory devise, a mere quit-claim deed, under a supposition that the contingent interest was thereby extinguished. Besides, from the very nature of these contingent interests also, the statute of limitations cannot commence running against them, in favor of a person claiming under the owner of the determinable fee, until twenty years after the contingent estate shall have vested in possession, by the happening of the contingency upon which it is to arise. I shall therefore proceed to examine this question with that care and deliberation which its importance demands.

Much contrariety of opinion will be found in the English law books on the subject of these executory interests ; and many decisions are contained in the reports which cannot easily be reconciled with each other. Executory devises, as contradistinguished from contingent or vested remainders, are

comparatively of recent origin. They differ from remainders in this : that in the case of an executory devise, the whole fee either descends to the heir at law until the happening of the event by which the contingent estate is to vest, or it is given to some other person as a base or determinable fee, or is parcelled out among heirs and devisees in such a manner as to exhaust the whole estate; and technically, there cannot be any portion of the estate which can vest in the contingent devisee as a *vested estate*, until the happening of the contingency upon which it is to vest in possession as well as *in interest*. It is upon this technical difficulty that all the doubts and conflicting opinions, first as to the *descendibility*, secondly as to the *releasability*, thirdly as to the *devisability*, and lastly as to the *assignability* of such contingent rights, have been founded. When the validity of these contingent limitations first came to be established, they were of course anomalous; as they were not coupled with any *estate*, although actually vested *in interest* in some person in being, who was known and identified by the terms of the will. They were, therefore, in the first place, likened to mere naked possibilities; such as the possibility that a son may inherit an estate from his father; that a creditor may obtain a judgment which may become a lien upon the land of his debtor; or that a particular person by marriage and the birth of a child, may become a tenant by the curtesy in the lands of a *feme sole*—in which cases, as the son, creditor, or intended husband, had no right or interest whatever in, or claim upon the land, he had nothing which could be released, or which could pass to any other person by descent. It was a possibility of this kind to which Littleton referred, in § 446, as not being releasable. In *Wood's case*, referred to in 1 *Coke*, 98, *b*., it was held that in the case of a covenant to stand seized of a future estate, to the use of the covenantee and his heirs, and where the covenantee died before the happening of the contingency, the heir took by descent; and it was there said that the covenantee only had a possibility of a use which could not be released or discharged. Then came *Lampet's case*, 10 *Coke's R*. 48, *b*., where it was held that a contingent future interest in a term, although in judgment of law the term was less than the life estate pre-

viously limited thereon, was releasable or might pass to the personal representative. And in *Marks* v. *Marks*, 1 *Strange*, 135, which came before Sir Joseph Jekyll, the master of the rolls, in 1718, it was held that a contingent future interest in a free hold estate, was a possibility coupled with an interest which would descend to the heir at law, and was *releasable;* and since the decision of this last case, no doubt seems to have existed in England, that a possibility, coupled with a future interest, was *descendible ;* if from the nature of the contingency the interest admitted of a descent. Also, that such possibilities might be released to the tenant of the freehold, either in fact or in law, or to any person entitled to a freehold estate, either in possession, reversion, or remainder, or to one who had a mere right in respect to privity of estate. Since that time, the only question which has arisen seems to be, whether such interests were devisable and assignable, as well as descendable and releasable. The difficulty on this subject has arisen from treating contingent or executory devises, although vested in interest and right in a person *in esse,* and identified, as mere vested *rights ;* and not as partaking of the character of vested remainders, which are both assignable and devisable, although they depend upon a future contingency, and may never vest in possession. By treating them as mere rights of action, or of entry, and likening them to such rights as could only be obtained at the common law by entry or by action, and by applying to them the principles of the common law doctrine as to the sale of litigated rights, and the statutes against champerty, the English black letter lawyers succeeded for a long time afterwards in rendering it doubtful whether they were devisable, or could be assigned to a stranger at law, although it was perfectly well settled that they could be both devised and assigned in equity. Since the decision of the court of common pleas in *Roe* v. *Jones*, 1 *H. Black. R.* 30, which was affirmed upon a writ of error to the court of kings bench, in 1789, 3 *T. R.* 88, it appears to be finally settled in England, that possibilities, coupled with an interest, although not technically clothed with an estate in possession, reversion or remainder, are in the nature of remainders, and as such are devisable. And although it appears by the opinions of Lord Ken-

ALBANY,
Dec. 1834.

Jackson
v.
Waldron.

yon and Mr. Justice Ashurst, in that case, that it was considered by them as previously settled that such interest were assignable at law as well as in equity, yet it is still questioned by many of the English elementary writers whether such estates are in fact assignable; notwithstanding it is well settled that they will pass to an assignee under the bankrupt law. Mr. Frasier, the editor of a recent edition of Coke's reports, in a note to *Shelley's case*, 1 *Coke*, 99, *a., note n.* 2, says, where a possibility is coupled with an interest, as where the person who is to take upon the happening of the contingency is fixed and ascertained, it may not only be bound by estoppel or contract, but may also be released, pass under the bargain and sale of commissioners of bankrupts, or be devised; though it cannot be granted or transferred by the ordinary rules of the common law. He refers to Preston as authority for this doctrine. 1 *Preston on Estates*, 76. Mr. Butler, in his note to Coke upon Littleton, *Coke Litt.* 265, *a., note* 212, says that it has been contended to be a rule at law, that whatsoever is devisable may be granted; and consequently, that the case of *Roe* v. *Jones* is an authority to show that contingent executory estates and interests may also be granted. *Jicklings*, in his valuable treaties on the analogy between legal and equitable estates, says that under the generic term of possibilities coupled with an interest, may be classed all contingent and executory interests in land—as springing and shifting uses, contingent remainders and executory devises; and after stating the rule of the ancient common law, that no possibility or right, or thing in action could be granted, he proceeds to say that such interests are clearly *releasable*, although not *devisable*. He then adverts to the more modern decisions, which settles the question that such possibilities, coupled with an interest, are advisable; and concludes with a very strong intimation of his opinion that such interests, when the person who is to take upon the happening of the contingency is ascertained, as in the present case, are universally transferable even at law. *Atherly*, in his valuable treaties on marriage settlements, is clearly of the opinion that such interests are assignable, and may be bound by a settlement at law. *Atherly*, 55. Indeed, I know of no principle,

either of law or of common sense, which should prevent the release, devise, or transfer of such an interest, in the same manner that a future estate in lands, by way of remainder, may be transferred, after it has actually vested in interest, but not in possession. *See also* 1 *Deacon's Bank. Law,* 364, *S. P.* I am, therefore, of opinion that by the assignment from Joseph and Medcef Eden to Winter, whether it be considered as an assignment of a mortgage interest, or as a grant of the freehold, the whole estate and interest of Medcef Eden, the younger, to which he was contingently entitled under the executory limitation in the will, passed to Winter, and was vested in the lessor of the plaintiff at the time of the commencement of this suit. The case of *Doe* v. *Tompkins,* 2 *Maule & Selw.* 165, referred to in the opinion of Mr. Justice Nelson, as being analogous to the present case, although at first it appears to be so, yet upon a careful examination will be found entirely different in principle. There the estate was first limited to the two sisters for their joint lives as tenants in common ; then a contingent remainder in the whole estate was given to the survivor for life, with power to such survivor to devise the fee. One of the sisters undertook to devise the fee during the lifetime of the other sister ; of course before it could be known whether the remainder for life would vest in her or her sister. Until that question was determined by the death of the sister, the power to devise was a mere naked possibility, not coupled with any estate or vested interest in the execution of the power. In this respect it was like a contingent limitation to the heir of A., where, of course, the person who was to take upon the happening of the contingency, could not be known or ascertained during the life of A. In the present case there was no uncertainty as to the person who was to take the executory interest in Joseph's share, provided the double contingency upon which the executory estate was given over to Medcef should ever occur. It was Medcef, and he alone, who was to take upon the occurrence of the contingency contemplated by the testator. In this respect it was the ordinary case of a limitation of an estate to one child in fee, with a contingent limitation over to another, if the first should die without issue in his lifetime ; in which

case the first takes a present freehold in possession, and the last a vested interest in the contingent fee, immediately upon the death of the testator. That a similar executory interest was vested in Joseph, in respect to another part of the testator's estate which was first given to Medcef in fee, does not alter the nature of the contingent interest of the latter in Joseph's share.

If a majority of the court should concur with me in the conclusions at which I have arrived, the judgment of the supreme court should be reversed, and that of the superior court affirmed; in which event, the judgment of this court must be special, in consequence of the several changes of parties since the commencement of the suit in the court below.

By Mr. Senator TRACY. One of the questions which this case presents for decision is, whether the execution of the assignment of the mortgage to Joseph Winter, by Joseph and Medcef Eden, was competently proved; or rather, if it were correct for the judge, under the circumstances appearing at the trial, to admit evidence of the signatures of Joseph and Medcef Eden, after it was proved that Eliza Bellamy, the subscribing witness, could not be found, but before proof of her hand-writing, or proof offered that faithful but unsuccessful efforts had been made to find witnesses acquainted with her hand-writing.

It is now so well settled, as not properly to be drawn into question, that the rule prescribing the order of proof to the execution of a sealed instrument is, 1. The production of the subscribing witness; 2. Where the witness is dead, out of the jurisdiction of the court, incompetent from crime or interest, or after diligent inquiry cannot be found, then proof of his hand-writing; 3. On the proof of any of the facts which excuse the production of the witness, and the additional proof of diligent and fruitless exertions to prove his hand-writing, then proof of the hand-writing of the party to the deed. The proof of the hand-writing of the subscribing witness, so far as I am acquainted with decisions, has been always regarded higher in nature, perhaps I should rather say safer and more satisfactory, than proof of the hand-writing of the party. I ac-

knowledge the reason of this preference is not, at first glance, perfectly obvious; and that it is not, has induced some learned judges, without, I am now satisfied, due reflection, to question the wisdom of the rule, and by their doubts throw over it a shade of discredit. But whatever may have been the origin of this rule, whether in the circumstances curiously and learnedly detailed by Ch. J. Kent, 3 *Johns. R.* 477, or in principles of a more universal and enduring nature, I am persuaded that good reasons may be found for maintaining it, over and above the consideration of its being so long settled and acknowledged. One of them, which strikes me as very apparent and forcible, is the greater risk a person incurs in forging the signatures of both witness and party, than of the party alone; coupled with which consideration is the important one, that in the suit on the obligation, the person whose name was forged as the subscribing witness, would be a competent witness to prove the forgery of his signature, while a party might be compelled to sit silently by, as I have myself witnessed, and see an instrument, to which he was an utter stranger, proved, by evidence of his hand-writing, to have been executed by him. But, without looking for further reasons in support of the rule, it is sufficient for governing my judgment in this case that such is the rule. None of the cases which have been cited question the obligation of the rule in respect to instruments under seal; and in the cases in this state, where it has been relaxed in regard to instruments not sealed, it was, if I understand the principle of the decisions, only on proof of the explicit acknowledgment of the execution by the party. The case in 6 *Binney*, 50, shows only that, while the judge had doubts of the wisdom of the rule, he looked upon it as too firmley settled to be departed from; and the case in 10 *Serge. & Rawle* is simply a reiteration of the same views, and almost in the same words. The incidental remarks of Chief Justice Savage, 2 *Wendell*, 575, referred only to the reasonableness of preferring a party's acknowledgment, to proof of the signature of a subscribing witness. The case in 11 *Mass. R.* 309, was on the principle and authority of *Hall* v. *Phelps*, 2 *Johns. R.* 450; and the distinction is expressly taken between an unsealed and a sealed instrument, the court remark-

ing, that in proving the latter, "something more is necessary to be proved than the mere signature of the party." The case in 3 *Binney*, 192, is where proof was allowed of the party's signature, after diligent and unsuccessful exertions to find proof of the hand-writing of the subscribing witness, who was out of the state ; and the decision no way impugns the general rule.   There is, however, in the case, a suggestion of Chief Justice Tilghman, entitled to much consideration, and which, as far as the power of this court can be legitimately exerted, I am disposed to have recognized as a rule : it is, that in addition to proof of the signature of the subscribing witness, that of the party's hand-writing should be always superadded.   Such I believe to be already the rule adopted to a considerable extent on trials in this state ; and I am not sure we are not justified in establishing it to be a general rule of evidence.   But to return to the immediate question.  I am convinced that there is no authority that countenances an inversion of the order of the rule, so as to admit proof of the party's signature, before showing distinctly that proof cannot be found of the hand-writing of the subscribing witness.  Even the learned judge who tried the cause, though he has, as I think, departed from the rule, does not, as appears from his opinion before us, either deny its force or question its wisdom. I quote from his remarks on this point, not only for the benfit of his authority, and the cases he cites in support of the rule, but also to show where, in the application of the rule to the case before him, he seems to have fallen short of the accute discrimination and accurate reasoning for which his decisions generally are so much distinguished.   " The general rule (he observes) undoubtedly is, that the execution of a sealed instrument must be proved by the subscribing witness, if he can be produced, and that evidence of the hand-writing of the party is not competent until the absense of the witness is accounted for.  5 *Cowen*, 385.  But it appears to be now settled, that when the name of the subscribing witness is fictitious, or when after diligent inquiry nothing can be heard of him, so that he can neither be produced nor his hand-writing proved ; or when he is dead, or out of the jurisdiction of the court, and no proof of his hand writing can be obtained ; in all these cases

it is competent to prove the hand-writing of the party himself. 1 *Phil. Ev.* 363. *Peake's N. P. C.* 23. 3 *Binney*, 192. 1 *Hayw.* 238. 2 *Carth.* 183. The general principle to be extracted from all these cases is, that the court must be satisfied that a diligent and *bona fide* search for the witness has been made ; and whether that search is seasonable, must depend in a degree upon the circumstances of each case. 'The rules and practice of the courts (says Chief Justice Kent) leave this point with some latitude of discretion.' 11 *Johns. R.* 65." By the foregoing extract, it will be observed that the judge, after correctly stating the law of the rule, proceeds to deduce from it the general principle that the court must be satisfied that a diligent and *bona fide* search for the witness has been made. So far as this principle goes, it is undoubtedly correct, and it goes far enough to dispense with the production of the subscribing witness; but this is but part of the principle which his authorities establish—the other part is, that the court must have equal proof of a diligent and *bona fide search for proof of the hand-writing of the witness*, before it can admit evidence of the party's signature. It is by omitting to extract this other part of the principle from the cases, that the judge reaches so easily the conclusion contained in the next paragraph of his opinion, "that the secondary proof of the execution of the instrument was properly admitted ;" and it is by a like process of reasoning that he concludes, that because a diligent inquiry had been made for the witness, and nothing could be heard of her, "it follows that no evidence of her hand-writing could be produced, and the only remaining proof in the case must be that of the hand-writing of the party." I am not ready to concede that a court can in any case dispense with the order of proof required by the rule, so as to admit evidence of the hand-writing of the party until some evidence has been offered to show that the hand-writing of the witness could not be proved—not even if the court feel satisfied in inferring that the same facts which account for the non-production of the witness make it improbable that his hand-writing could be proved ; for this is enabling a court to overleap a positive rule of evidence, on its own notions that its application is inconvenient or unnecessary in the particular

case. Nor do I understand the remarks of Chief Justice Kent, 11 *Johns. R.* 65, as in any respect sanctioning such a principle. True it is that the proofs offered for dispensing with primary, to let in secondary evidence are addressed to the court, which, in the exercise of a sound legal discretion —a discretion itself the subject of review—is to determine on the sufficiency of the proof thus addressed to it; and in this respect, and in this only, is it necessary that there should be allowed " some latitude of discretion." But this is not a latitude of discretion to authorize in any case a dispensing with the rule altogether, for this would be a discretion not upon the sufficiency of proofs, but over the law itself prescribed for their government.

But if there can be a case imagined, which I do not believe, where proof that a subscribing witness cannot be found, shall of itself be deemed evidence that his hand-writing cannot be proved, this surely is not such a case. Here the proof, on the part of the plaintiff, shows that Eliza Bellamy, the subscribing witness, was from sixteen to twenty years of age at the time of the assignment; that she was house-keeper for the Edens all the time they lived at Mount Pleasant, between one and two years; and that the witness proving these facts lived near her all this time. On this proof, nothing can be more inconsequential than the conclusion, that because the witness did not know what had become of Eliza Bellamy, therefore he had no knowledge of her hand-writing. What motive prevented the plaintiff from asking his own witness, then in court, whether he knew Eliza Bellamy's hand-writing is not *morally* certain, but it is *legally* certain that it was a sinister one—an apprehension that the answer would affect his case prejudicially. *Stark. Ev., pt.* 1, § 75. Again, the other witness, James Agnew, so from showing that no witnesses could be found to prove Eliza Bellamy's hand-writing, shows what makes it probable that they might be found. The sole object of his inquiry seems to have been for the person of Eliza Bellamy, and not for proof of her hand-writing, nor even for persons who knew her. He testifies, to be sure, that " he knew no person but Merritt who knew her," but he heard of others " who had heard of her." It is no unreasona-

ble presumption, that if he had sought those who "had heard of her," he might have obtained information of others who had known her, and were acquainted with her hand-writing; at least, it was a natural path to such proof, but he did not follow it. But without pursuing the matter further than the omission to attempt proving her signature by David Merritt, this alone suffices to compel me to decide that the exception to the proof of the party's hand-writing, at the stage when it was introduced, was well taken; and on this ground, at least, the supreme court was right in *reversing* the judgment of the court below. But to reverse the judgment for this cause only, and order a *venire de novo*, would be renewing and continuing a litigation already surprisingly protracted; and as the merits of the whole case have been fully and ably argued, it is right to make, if possible a definitive disposition of it.

All the questions affecting the title of the respective parties, arise upon the construction and effect of the instrument executed by Joseph and Medcef Eden to Joseph Winter, on the first day of September, 1804, and which is termed an assignment of a mortgage; and these questions are, 1. Whether the act of assignment by the Edens does not of itself prove that the mortgage was outstanding and valid, and consequently a subsisting and enforcible lien on the lot; 2. Whether, if Medcef Eden the elder had a freehold estate, so that the mortgage in his hands was sunk and extinguished, his sons were not concluded or estopped, by assigning the mortgage, from afterwards alleging any fact to show that the mortgage had ceased to be a lien on the premises; 3. If neither of these grounds is sustained, then whether the instrument of assignment was a valid and sufficient conveyance to Joseph Winter of all the estate and interest which the brothers, Joseph and Medcef, had in the estate under their father's will. The examination of these propositions will necessarily embrace also the examination of the two principal propositions on the part of the defendants, which are, 1. That the instrument of assignment purports to convey a freehold estate from Joseph Eden to Joseph Winter, and that Winter, by accepting such conveyance, is estopped from alleging that he acquired only a mortgage interest, or that the Edens had not a freehold es-

tate; 2. That Medcef Eden, when he executed the convey-
ance, had no interest in the premises which could pass by
deed. The second proposition for the plaintiff, as I have stat-
ed it, contains, it will be seen, the whole strength of his first
proposition and something more ; and it also embraces the de-
fendants' proposition of a counter estoppel, so that the three
may naturally be disposed of together, in the exposition of my
views of the construction and effect which must be given to
the instrument executed by the Edens to Winter.

But before doing so, and to do so intelligibly, it is proper to
explain my conclusions on the facts appearing in the case out
of the instrument, and which may afford an important aid to
us for finding its true construction, and by its true construc-
tion is understood that construction which the parties intend-
ed it to have when they executed it. It can scarcely be ne-
cessary to cite authorities to sustain, what the first principles
of reason and justice dictate, that the intention of parties to
an instrument is what should be first sought. It is a maxim
of the highest antiquity in the law, that all deeds shall be
construed favorably, and as near the apparent intention of the
parties as possible, consistent with rules of law. 4 *Cruise's
Dig tit.* 32, *Deed, ch.* 19. The first fact then desirable to be
ascertained is, whether the elder Eden had any, and if any,
what estate in the premises, previously to his purchasing the
mortgage of Sheffield Howard. I confess this fact seems to me
to have less importance than is attached to it by the parties,
if we can judge by the eagerness with which they contest it.
To be sure, if Medcef Eden the elder was in possession, claim-
ing title when he acquired the mortgage by assignment, there
could be no doubt that the mortgage would be merged and
extinguished in the greater estate. The reasonableness of
this principle is no less apparent than the authorities for it are
plain and positive. *James* v. *Morey,* 2 *Cowen,* 300, 313, 318.
4 *Kent's Comm.* 102. 18 *Vesey,* 393. But the evidence of
this fact is loose and unsatisfactory, and it is not aided by the
verdict, for the judge, on the trial, regarding the whole ques-
tion between the parties to turn on the execution of the as-
signment by Medcef Eden the younger to Winter, took from
the jury the power of deciding upon the conflicting proof as to

the original possession and claim of the elder Eden. If, therefore, the fact whether the elder Eden's *possession* was *anterior*, to his purchase of the mortgage from Sheffield Howard, be as important as the counsel have seemed to regret it, the judgment below for this cause also should be reversed, and a new trial directed, that the jury might pass on the evidence to this fact; but, in my view of the case, it is of very little importance whether the elder Eden went into possession anterior to or at the time of purchasing the mortgage from Howard, or indeed what his precedent claim to the premises was. It is undisputed that he was in possession at least as early as the date of the assignment, which was December, 1783, and all the facts prove, beyond reasonable doubt, that when in possession, he claimed to be the owner; and it is as satisfactorily established, as under the circumstances of the case can be expected, that during the whole period of his possession, his conduct was consistent with his claim of title to the freehold. That it was a just and legal title to the fee is not attempted to be shown, nor is it necessary it should be; it is sufficient that it was a claim and title enough to constitute his possession adverse to whomsoever had a better title, if there was such a person, which is not very certain, and consequently sufficient to lay the foundation for a title, which twenty years possession would mature and perfect. It is idle to say that he was in possession as mortgagee. No matter if it was in that character that his possession commenced, when we see him instantly disclaiming it and holding himself out to the world as the absolute owner. To this point the proof is all one way, and the conclusion cannot be escaped, that he claimed some other and greater estate in the premises than that of assignee of the mortgage from Bridgewater to Howard. This claim was coeval with his possession, for there is no reason to suppose it was intermitted, during the fifteen years that he lived, after it commenced; and his solemn disposition of the property in his last will and testament as a freehold, and in the same form and manner as he gave his other estates, which were confessedly freeholds, leaves no doubt of the nature of his possession, nor consequently of the possession which at his death devolved on Joseph Eden, his son and

devisee. This possession by Joseph, or others claiming under him, continued unbroken and undisputed for six years, and up to the time of the assignment of the mortgage to Joseph Winter, making in the whole a continuous possession, adverse to all claiming title, if any there were, of about twenty-one years. That such a possession, however commenced, after lasting twenty years, constituted a complete title, admits of no question ; for even had the elder Eden taken possession acknowledgedly as mortgagee, the lapse of time, perhaps without, but certainly coupled as it was with a claim of a different estate, would extinguish all right of redemption in the mortgagor as his representative, and make the title as conclusive against him as against the rest of the world : to this point there are numerous and direct authorities, but I will refer only to a few among them.    3 *Atk.* 313.    2 *Sch. & Lef.* 637. 1 *Ves. & Beame,* 538. 2 *Jacob & Walker,* 88.    10 *Wheaton,* 168, 174.

In any view, then, that can be taken of the elder Eden's title, the title of Joseph Eden, the son, on the first day of September, 1804, the date of the conveyance to Joseph Winter, aside from his assignment under the insolvent law, which it is not necessary to notice now, was perfect and complete to as large an estate as he could take under his father's will. What this estate was, admits I think of no doubt ; for notwithstanding the criticism made at the argument as to the technical construction of the language of the will, and especially on the word *bequeath,* it is very plain that the elder Eden intended to devise and actually did devise this lot to his son Joseph in the same tenure as the other lands which he gave to him ; which tenure has been repeatedly decided by this court to be a determinable, qualified or base fee. This fee or freehold estate, although the title to it might have been defective at the time of the devise, had become perfect in Joseph, so that no person not claiming under him could disturb him in it. It is not necessary to speak in this place of the contingent interest of Medcef the brother, as my object here is first to establish what I deem an important proposition, to aid in construing the instrument or assignment given to Winter—which proposition is, that when Joseph Eden was about to execute that

instrument, he was in fact the owner of the freehold describ-ed in the mortgage. With this proposition established and borne in mind, to assist in determining the true meaning of the parties to the conveyance, we shall be prepared to enter into the murky maze of the doctrine of estoppels, with the best light that can be had for guiding us safely through it.

Lord Coke calls estoppels "an excellent and curious kind of learning," and so indeed it may be for those who, revelling in the glorious uncertainty of the law, drive a profitable trade in vain sophisms and frivolous subtleties; but to a plain mind, which has no aid to the inquiry but common sense, and no motive but truth and justice, "this excellent and curious learning" appears only as a metaphysical jungle, darkly thick with obscure distinctions and palpable contradictions, so that the eye of unsophisticated reason must despair to penetrate it. Let him who would vindicate this learning of estoppels, from what may seem a rash and unfounded aspersion, open *Comyn's Digest* or *Viner's Abridgment* at this title, and read, among many others, consecutive propositions like the follow-ing: "Estoppels ought to be certain to *every intent;*" "If an es-toppel be certain to *common intent*, it is sufficient;" " A *rehearsal* of a deed shall never be an estoppel;" " If a man by indenture *recite* the deed, it shall estop him;" and I am persuaded, unless he have a clue to this labyrinth that I have not found—a light through this " palpable obscure" of which I am deprived—he will agree with me that this " excellent and curious kind of learning" is little better than a chaotic mass of crudities, contradictions and absurdities, scarcely more intelligible than the many-tongued jargon of Babel; at any rate, that it has no pretension to the character of a science, as that term has been happily defined—" the knowl-edge of many, orderly and methodically arranged, so as to become attainable by one."

I shall not deny, nor do I doubt that this doctrine, in its virgin purity and simplicity, before it was bedizzened and ob-scured with the meretricious and many colored drapery in which lawyers and judges have dressed it, was consistent with truth and justice and good sense; but legal ingenuity has spun and wove for it so many and various garments, that it is

ALBANY,
Dec. 1834.

Jackson
v.
Waldron.

now difficult, if not impracticable, to ascertain its primitive form and features. Were I to attempt this task, I should assume that in its original application to deeds, the principle of estoppel had for its purpose nothing further than to prevent a circuity of action, or at most, nothing more than to compel the parties to deeds to fulfil the contracts contained in them according to their legal and equitable obligation. In short, whenever a person, by assenting or engaging that a particular fact existed, induced another to contract with him, the person thus assenting or engaging should not, by a denial of this fact, compel the injured party to seek by another suit, redress against his bad faith. The whole justice of the case being apparent to the court, it would fitly and properly exercise its power to enforce it without the delay of a new litigation ; and this, not on the ground of concluding a party from showing the truth, but because the whole being shown, it does not change the justice of the case. " It is," says Justice Buller, 1 *T. R.* 446, " a maxim of law so to judge of contracts as to prevent multiplicity of actions." Thus a familiar case repeatedly decided in our courts ; If A, having no title, convey to B. with covenant of warranty, and afterwards A. acquires title, he shall not evict B. ; and why ? not on the ground that he had a title when he had not, (which is shere nonsense,) but because, having agreed to make a good title, and having now the power, the court will compel him to do it, and thus fulfil the whole duties arising on the agreement, without putting B. to a circuity of action. *Litt.* § 446. 14 *Johns. R.* 194. 1 *Cowen,* 616. *id.* 18. 4 *Wendell,* 622. It is on a principle entirely analogous that Chief Justice Spencer says, in *Chandler* v. *Herrick* 19 *Johns R.* 134, " It is well settled, that a covenant never to sue an obligor may be pleaded as a release to avoid circuity of action." This is the common sense meaning of an estoppel, and far more reconcileable with reason and morality than the technical definition which makes it " that which concludeth a man to allege the truth"—a definition so revolting to moral sense, and so inconsistent with the foundation principle of justice, which is truth, that some attempts have been made to modify it, by denominating an estoppel " that which is to sustain the cause of truth, in preference to the

truth of a particular cause;" but this is rather ingenious than sound—too subtle and refined to subserve the cause for which it is invented.    One truth cannot be inconsistent with another, for they are all parts of the same harmonious whole. "The judicious Hooker" thinks it may be "by circuit of deduction that all truth out of any truth may be concluded." But without affirming this, we may affirm that truth by her nature must be perfect, entire, absolute.  She loves open dealing ; she resorts to no subterfuge ; she descends to no compromise ; she needs no coloring : to sum all, in the language of nature's poet, " truth is truth ;" and it is as monstrous an error to suppose that falsehood can be useful to her, as that virtue can borrow crime for its support.

It is not possible to reconcile all the various decisions on the subject of estoppels which have been made from the year books down; but were we compelled to refer them all to some general, but single principle, I am persuaded there is no one to which they will so well conform as that to which I have endeavored to state.   Even the rules for the construction of estoppels, given by Lord Coke himself, subtle and incongruous as some of them are, yet, on the whole, point to this principle with as much distinctness as could be expected from one who, though a great man and a learned lawyer, was too much imbued with the spirit of the age in which he lived not to delight to "split the weight of things on the hair-breadth of words."   His second rule affirms, " that every estoppel must be certain to every intent, and not to be taken by argument or inference."   His third, that " every estoppel ought to be a precise affirmation of that which maketh the estoppel." His sixth, " Estoppel against estoppel doth put the matter at large."   His eighth, " Where the veritie is apparent in the same record, there the adverse party shall not be estopped." These rules evidently are founded on the principle, that the party to be estopped should distinctly and positively have affirmed some fact which the other party had made a foundation or inducement for his contract.   In such case, it is obvious that the person practicing deceit or fraud should be compelled to render justice to the injured party, and the measure of this justice is equally obvious—that of doing what he

had agreed to do. The doubts and contradictions found in the early reports, whether matter contained in a recital will operate by estoppel, as resolved in *Shelley* v. *Wright, Willes*, 9, in conformity to this principle : that is, where a direct affirmation of a material fact is made in the recital, it shall operate equally by way of estoppel as though contained in the body of the deed; and this for the plain reason that it is equally a component part of the parties' contract. This case is also reconcileable with Lord Holt's rule in *Salter* v. *Kidley*, 1 *Show*. 59, that though a general recital is not an estoppel, the recital of a particular fact is : in other words, though a party is not liable for the mis-recital of matters not forming a natural inducement for the contract of the other party, he is liable for the affirmation of a particular fact which does form such inducement, whatever may be the form of words in which he asserts it. The recent decisions in 2 *Barn. & Adolph*, 278, 5 *Russell's Ch. Rep*. 8 *Cowen*, 586, are on the same principle as the case in *Willes ;* and it is, I think, in entire conformity with this principle that estoppels *in pais* are construed. In *Hearn* v. *Rogers*, 5 *Mann. & Ryl*. 495, the court say "There can be no doubt that the express admission of a party to a suit, or an admission implied from his contract, is evidence, and strong evidence against him ; but we think he is at liberty to show that such admission was misunderstood or *untrue*, and that he is not *estopped* or concluded by it, unless it has had the effect of altering the condition of some third person."

Without venturing, then, to assert that there are no cases which countenance different notions of estoppel from that which I have advanced, I yet feel warranted in saying that the best, most rational, and only general principle which can be extracted from the numerous and contradictory decisions on the subject, is, that in order for a matter to operate as an estoppel in a deed, it should be such matter and so alledged that, if untrue, the party alleging it would be liable in some form of action, either at law or in equity, to respond in damages to the party injured, for a covenant broken or for deceit and fraud. I am not prepared to say that the questions of estoppel which arise in the present case might not be disposed of without the application of so rigorous a rule, but I prefer to

state it and rely upon it as the rule which shall guide my examination of the construction and effect of the deed or assignment in which this litigation has its origin. With this deed or instrument before us, and bearing in mind the condition of the parties at the time of its execution, and especially the fact that Joseph Eden, except for his assignment under the insolvent law, had a freehold estate in the premises, free and clear from all equity of redemption by John Bridgewater or any person claiming under him, let us proceed to ascertain what is the true construction or legal meaning of this instrument, called an assignment.

First: It plainly and distinctly recites the execution of the mortgage by John Bridgewater and Mary his wife to Sheffield Howard, and its due assignment to Medcef Eden the elder. Next, it as plainly recites the devise of the premises by Eden to his son Joseph; and by referring to the will, and thus making the will a part of the recital, it effectually recites that the devise was of a fee, and then that Martha, Joseph and Medcef Eden were the executors of Medcef Eden the elder. Thus far, which is as far as the recital goes, the assignment contains nothing disputable, nothing which is not otherwise established in the case by competent proof. Then comes the grant, which may be divided into two parts, of which one is the assignment of " the aforesaid indenture of mortgage and the bond therein mentioned, and all monies due and to grow due thereon ;" the other is the release and conveyance by Marth, Joseph and Medcef Eden, for themselves and their heirs, to the said Joseph Winter and his heirs and assigns, of all their " right, title and interest, of, in and to the said lot of ground before mentioned, and every part and parcel thereof." According to my view of the case, the first question to be asked is, whether there is in this instrument any covenant or agreement, express or implied, that the mortgage was valid and subsisting ; or any thing in the nature of a covenant or agreement that the debt was outstanding. It certainly has not a covenant, in the form usual in the assignment of such obligations, that the money was due according to the condition, nor any direct authority for Winter to collect and enjoy

it; though this doubtless was unnecessary, yet, being usual, may weigh something against an implication. Next, does it contain any distinct and substantive affirmation, which is inconsistent with the fact that the mortgage was sunk and extinguished? In the recital there is nothing like it, and in the granting or assigning part, there is nothing beyond a simple release or quit-claim. The expression "moneys due and to grow due" is thought to be particularly significant, and especially the words "to grow due," which are supposed to indicate that there was interest regularly accruing on the obligation. This I think a forced construction, for it seems to me that the latter words are of no import whatever—that is, the simple words "moneys due" would embrace the whole, as well principal as interest: and if there were not "moneys due," there could not be any to grow due; for if the principle were extinguished, there would be nothing left for interest to accrue upon—so that, in any view, no distinctive force attaches, beyond what should be given to the simple words "moneys due." But how the whole expression gives to the assignment any different character than it would have were it not there, is more than I can perceive. It certainly gives to the assignee no greater rights or power over the obligations assigned than he would have without it; and it can give him no greater claims against the assignors, unless the expression amounts to a covenant that there are moneys due and to grow due. Does it amount to such a covenant? It is easily tested, by inquiring whether, if Winter, in seeking to collect the bond from John Bridgewater, had been met by a discharge in full from Medcef Eden the elder, he would have had any remedy at law or in equity against these assignors. If not, how can it be said that there is in the assignment a distinct affirmation, or even representation, that it was a valid and subsisting obligation, on which there were "moneys due and to grow due?" If therefore the instrument stopped with the assignment of the bond and mortgage, and had not a syllable in it purporting to release and convey any other interest, it would not, agreeably to my notion of an estoppel, prevent the assignors from proving that the mortgage had been previously to its assignment sunk and extinguished in the fee es-

tate of the elder Eden. But the case does not require going so far, for the residue of the instrument purporting to be a release and conveyance of the freehold, shows satisfactorily that there could have been no agreement or affirmation intended, that the mortgage was valid and outstanding. I will not argue, for I do not believe, that Winter intended to take the mortgage as a mere muniment or accompaniment of the title. There seems no sufficient motive for his doing so. Nor do I hold that the mere release he took of the Edens' interest in the property, though it purported to be a fee interest, would, under the circumstances, conclude him from showing, if the fact were so, that the mortgage was valid and outstanding. For instance, if he could prove a distinct and solemn avowal, made by the elder Eden, that he held his possession only as a mortgagee, and one equally distinct by John Bridgewater that the mortgage was due and unpaid, I should not hesitate to say that he might proceed to enforce collection by foreclosure or otherwise *malgre* any estoppel worked by having accepted the release from the Edens. In fine, there appears to be nothing, in the instrument executed by the Edens to Winter, to conclude either of the parties from proving any fact which would illustrate and establish the true condition of the mortgage, or the actual character of the estate, at the time of the transaction. There is, I think, nothing which shows the Edens meant to affirm the mortgage to be good ; and nothing to prove that Winter meant to receive it as good for nothing. We can only conjecture all the motives of the parties, but enough appears to warrant a suspicion that the negotiation had its origin and consummation in a design by the Edens on the one hand to make something at the expense of their creditors, and by Winter on the other to make something at the expense of the Edens and their creditors. To accomplish this effectually, the instrument shows that the Edens intended to release and convey all their interest in the premises, without stipulating what that interest was ; and that Winter intended to get it all without caring in what form it came. This is the common sense interpretation of the assignment; and while, therefore, I look upon both parties as *in pari delictu* as to motive, I do not regard either as technically estopped,

by any thing in the deed, from showing that the mortgage was or was not a valid lien on the premises at the time of its assignment.

The next and more embarrassing inquiry is as to the effect of the release and conveyance by Medcef Eden, the younger, of all his " right, title and interest, of, in and to the said lot of ground and premises, to Joseph Winter and his heirs and assigns." Whether Medcef Eden the younger was seized of any estate whatever, or had any right, title or interest in the premises, which he could release, seems to be the only question; for, that the form of the release is sufficient to convey all that he could convey, is not a matter drawn into discussion, It is unnecessary, for this inquiry, to look particularly into the will of the elder Eden, or to revive a matter which has been repeatedly discussed and decided by this court, as to the estate which the two sons took under that will. It is sufficient that it is settled irrevocably, that Medcef having survived his brother Joseph who died without children, became seized in fee, at his death, of all the real estate devised to him by his father, and this notwithstanding any disposition which he (Joseph) had made of it in his lifetime. The difficulty, therefore, is not in determining what would be Medcef's estate at his brother's death, but in ascertaining and denominating the estate, right or interest which he had in the property during his brother's life.

It is not disputed that the deed to Winter conveys all the present estate, right and interest which Medcef then had, and which was conveyable; nor is it, on the other hand, contended that it in terms purports to convey any future estate, right or interest which Medcef might have. But if such had been the form, or is the construction claimed, it would not affect the question; for it is an ancient maxim of the law, and one of the few ancient maxims on the subject of conveyances which have remained without variableness or shadow of turning, that a release, or, as it is commonly termed, a quit-claim deed, can pass only such right or estate as the party has at the time, even though it profess to convey his future right or estate, except it contain a covenant of warranty. The text of *Littleton*, § 446, is " also those words which are commonly

put in such release, *scilicet* (*quæ quovismodo in futurum ha-bere potero*) are as void in law, for no right passeth by a release, but the right which the releasor hath at the time of the release made." So far as I know, all the cases, from the time of Littleton perfectly conform to his proposition. In 4 *Mass. R.* 688, Sewell, J., citing *Co. Litt.* 265, affirms the rule of the common law to be, that no right passes but the right which the releasor had at the time of release made ; and the decisions in our courts, already cited to another point, are distinct and positive recognitions of the rule in Littleton. If the decisions, 1 *Johns. Cas.* 81, and 12 *Johns. R.* 201, conflict with the proposition, but which is not evident, they have been virtually overruled by the same court, and at any rate cannot be admitted here, to overturn a principle so long settled, and universally recognized. But to establish the proposition that Medcef Eden did not and could not convey to Winter any right which he had not, at the time of release made, goes very little way towards resolving the difficulties that remain—which are 1. What right or interest had Medcef Eden at the time ? and 2. Was that right or interest releasable ?

If it were permitted to throw aside all the technical learning of the dark ages of the law, and to contemn the attenuated reasonings, curious subtleties, and refined distinctions which have sprung out of it, there would be, I apprehend, under the guidance of unsophisticated reason and sound common sense, little difficulty experienced in determining that Medcef Eden, on the death of his father and under his will, obtained a right in the premises which was of some value. True it was contingent and uncertain whether this right ever matured into the possession and fruition of a perfect estate ; but the same is also true of many other highly esteemed rights and interests, which, because the enjoyment of them in their greatest extent may never be attained, it would be absurd to deny to them a present existence and value ; they are the germs of fruits which, though cast upon an uncertain soil, yet, as they belong to us, engage our thoughts, interest our feelings, and sustain our hopes—for they may spring up and bring for us a rich, abundant harvest. To exclude, therefore, from the circle of our rights and interests, all that are contin-

gent and uncertain, would be fearfully circumscribing both our possessions and enjoyments. But the law has its rules, which, though they may not seem always to conform to the dictates of enlightened reason, are nevertheless, when fairly ascertained, to bind the tribunals appointed merely for administering them, as effectually, as though the reason of every rule was as certain as demonstrations in the exact sciences; and especially should this hold in regard to the rules of real property—for the most of them, in their origin, are so artificial and purely technical, that if courts begin to innovate for the purpose of conforming them to existing notions of abstract reason and justice, half the titles of the country might be overturned before a place could be found at which to stop.

But, to return to the immediate inquiry, what was the nature of Medcef Eden's right in the estate during his brother's life? Both sides agree to call it a possibility, but disagree whether it were what the law terms a mere naked possibility, or a possibility coupled with an interest. On this point the case mainly turns—and the first object, therefore, is, to ascertain the distinction between these two kinds of possibility. The line of this distinction, to say the best of it, is extremely obscure, even if the principle of it be not confused and unintelligible. I do not mean by this, that a broad distinction may not be shown between some cases that are given to illustrate a possibility coupled with an interest, and others to illustrate a naked possibility; but between cases approaching the dividing line, it requires the keenest optics to detect the distinction. Thus, the right or interest which one may have as heir apparent or heir presumptive, is very disinguishable from that one has under a device, which gives him an estate in fee simple on the contingency that the first devisee dies without issue; for the heir, during the life of the ancestor, not only has no estate, but even if he survive him, he will not necessarily get any—for the entire and unlimited estate being in another, it is in his mere volition to sell it or to devise it to another; in short, the interest of the heir does not differ in its nature from that of an expectant devisee, which is an interest which every one may claim to have in every other's estate. But in the other case, the contingent devisee has a defined

right in expectation, which is independent of the volition or caprice of any other; and on the happening of a contingency which Providence alone controls, he must come to the enjoyment of the full estate. In two such cases, I say, one can easily recognize the distinction between a mere naked possibility and a possibility coupled with an interest; but between the cases of *Jones* v. *Roe*, 3 *T. R.* 88, and *Moore* v. *Hawkins*, 2 *Eden's Ch. Cas.* 341, and the present case, I confess, there is more difficulty in finding any better distinction than what is founded in an arbitrary rule. The first of the cases cited was this: John Lockyer, being seized in fee in 1734, devised as follows: "I give my lands, &c. to my brother Thomas, till his son John or any *other* of his younger sons attain 21; in case no younger son attain 21, then till such only son be 21, in trust that the rents be preserved and laid out as the surplus of personal estate is directed; and when said John or other younger son born, or to be born, shall be 21, then I give said lands, &c. to said John, or such younger son as shall be a younger son and first be 21, and to his heirs and assigns. But if my brother Thomas have but one son that shall live to be 21, then I give to him, his heirs," &c. The testator died October, 1734, leaving Thomas, his brother, his heir at law, and J. T. L. and John, the two sons of Thomas, and who were then his only issue. John died in 1751, under 21; J. T. L., the eldest son, attained 21, married, and in 1759 made his will, devising all his estate, whether in possession, remainder or reversion, to his wife, and died in 1765, leaving his father surviving, who had been in possession from the death of the first testator, and continued till 1785. The question was, whether the eldest son, on attaining 21 and being then the only son, had a devisable interest, inasmuch as his father who survived him might have a younger son, who should attain 21 and be entitled to the freehold; and it was held by the court that J. T. L. had a possibility coupled with an interest which was devisable. But yet it is evident that the event which was to designate the eldest son as the person who could take the estate, to wit, that he should be the only son who attained 21, had not happened during his life, and it was not certain it would ever happen, inasmuch as his father sur-

vived him.   The other case, that of *Moore* v. *Hawkins,* is on the same principle, though perhaps not quite so strong.   There the testator devised in trust for his son J., and if he should die without issue and under 21, then to C. and his heirs.   C. devised the estate and died, leaving the son J. surviving, but who afterwards died without issue and under 21.   Here also the event on which C. was to take the estate had not happened at the time of his devise and death, nor was it certain it ever would happen ; and yet the devise was held good on the principle that C. had a possibility coupled with an interest.   I am aware of the distinction insisted on between these cases and some others to the same point, and the one before us ; it is that in them the person to whom the estate should go on the happening of the contingency was ascertained, as in the first case J. T. L., the eldest son, having attained 21, was a person certain who must have the estate, provided no other son attained 21 ; and in the latter case, C. or his heirs must take the estate in case the son J. died without issue under 21 ; while, in the present case, the direction of the estate, if Joseph died without issue, was not necessarily to Medcef or his heirs, except on the contingency that Medcef survived his brother ; and it is said if the estate had been given to Joseph and his heirs, with a limitation over in case Joseph died without issue to Medcef and his heirs, that then Medcef's estate, during Joseph's life, would have come within the rule of *Moore* v. *Hawkins,* and he could devise or release it.   But as no estate could come to Medcef or his heirs unless he survived Joseph, consequently neither he nor his heirs were ascertained to be persons who could take the estate, even if Joseph died without issue.   In one light this may seem to be a hair-drawn distinction—for though neither Medcef nor his heirs could take unless he survived Joseph dying without issue, so in the other case could neither C. nor his heirs take, though he did survive J., the son dying without issue, unless the son died also before attaining the age of 21.   And if we were allowed to determine the interest coupled with a possibility, by the degree of moral probability there was of the happening of the contingency, we should have to admit that there are many cases where the probability that one given person will survive

another given person, is much greater than that a given person will not attain the age of 21 ; and this is the relative nature of the chances in this case, and that of *Moore* v. *Hawkins*. But the rule for discriminating between the two kinds of possibilities cannot be substituted by one which allows the interest in a contingency to be measured merely by the moral probability, that the contingency will occur, without also subverting another settled rule—that no interests are devisable except such as are descendible.

For a long time the doctrine was maintained, that some contingent interest, though descendable, were not devisable or conveyable ; but I am not aware that the converse of this proposition was ever asserted. But, however this may be, it is now settled by authorities to which I shall presently advert, that descendible and advisable are convertible terms in respect to the qualities of contingent interests ; and if so, a broad line of distinction can be traced between the contingent interest in the present case, and in cases like that of *Moore* v. *Hawkins*. There the contingent interest being devised to C. and his heirs, it would, on the death of C., descend to his heirs, whose position in regard to it would be exactly that of their ancestor ; consequently, under the rule that descendible and devisable are convertible terms, the power of C. to devise is undeniable. But in the present case it is obvious that the contingent interest of Medcef Eden was not descendible, because his death, which was the event necessary to cast the descent, was that event which determined the possibility on which the estate was to be directed towards him. To suppose, therefore, that in the lifetime of his brother Joseph he had a devisable interest, would be supposing a case in palpable contradiction to the principle that descendible and devisable are convertible terms ; and would morever involve the absurdity of allowing him to transmit through his death that contingent possibility, which it is the precise direction of his father's will that his death should determine.

It seems to me, then, that however far the decisions may go to sustain devises of contingent interests, they do not aid the present case, unless, they go so far as to maintain that in-

ALBANY,
Dec. 1834.

Jackson
v.
Waldron.

terests too remote and naked for descent may yet be devised—a proposition which, I believe, has never been advanced ; on the contrary, the struggle was for many years in the courts, to establish a power to devise co-extensive what that of descent, and the most that has been asked in behalf of contingent interests is, that they should be held transmissible by the act of the party, by devise or release, whenever they are transmissible by operation of law by way of descent.

Mr. *Fearne*, after examining the cases above referred to, and some others, remarks : "These authorites have established the power of testamentary dispositions of contingent and executory estates and possibilities accompanied with an interest, and of such as would be descendible to the heir of the object of them dying before the contingency on which the vesting or acquisition of the estate depended.   But these decisions do not appear to reach those cases, where neither the contingent interest is transmissible from any person until the contingency decides him to be an object of the limitation, nor the person or persons to or amongst whom the contingent interest is directed, is  or are in  any degree ascertainable before  the contingency happens ; as  in the case of a contingent or executory devise to the right heirs of J. S., then living, where  the description of  the person to take  cannot be confined to or amongst any ascertainable person or persons, during the life of J. S.; nor can it be said in whom such interest is, nor that it is in any body during the period ; nor will it be transmissible or descendible from any dying before it becomes vested."   It must be admitted  that Mr. Fearne states the doctrine broad  enough to take in  the  present question, though his illustration, which is *Lampett's case*, 10 *Coke*, 46, is far from being analogous.  And if the books contained nothing more than such a general view of the doctrine, without more opposite illustrations than this which Mr. Fearne gives, I could not yield up a persuasion which the simple statement of the case is calculated to make, that Medcef Eden had an interest in the possibility of taking the estate as survivor of his brother. But I am  bound to say the authorities are explicit and positive, that a grant to the survivor, of two or more, gives to neither any thing more than a mere naked possibility, before the

contingency occurs. In *Cro. Eliz.* 841, Popham, Ch. J., says, it was adjudged, 17 *Eliz.* "where a lease was made to two for life, remainder to him who should survive of those two for forty years, they both joined in a grant, yet the grant was merely void because the term was not vested *in any of them*. This case is also referred to in *Lampett's Case*, 10 *Coke*, and held good law, and is also recognized by *Bacon, tit. Release*, 4. In *Roe* v. *Griffith*, 1 *W. Black.*, Lord Mansfield puts the distinction between the two classes of possibility on the ground that in one the person is certain, and in the other not; and Buller, J., in the same case, calls it a sound principle between a bare possibility and one coupled with an interest. Also in *Jones* v. *Roe*, before cited, the principle seems to be recognized as indisputable, that if the person to take the contingent estate was contingent or uncertain, it was but a naked possibility ; and in *Selwyn* v. *Selwyn*, 1 *Black.* 225, 2 *Burr.* 1131, the transmissibility of the estate seemed to turn on the circumstance that it was certain from the beginning who would take, provided the contingency happened. The more recent case of *Doe* v. *Tompkinson. 2 Maule & Selw.* 165, (1813,) cited by the supreme court, was where there was a devise of real and personal estate to two sisters, or to the survivors of them and to be disposed of by the survivor as she should by will direct; one of the sisters, in the lifetime of both, made a will, devising the property ; she survived her sister, but did not republish her will after she became the survivor, and it was held that during the life of both neither had a devisable interest—Lord Ellenborough, putting the decision on the ground that during the life of both it was not *in any degree ascertainable* who was the person that was to take from the first testator. Le Blanc, J., thought the point too clear for doubt, and Dampier said it was plainly distinguishable from *Selwyn* v. *Selwyn*, where the person was designated, and therefore apparent who was to take on the happening of the contingency. The elementary writers, though not very full on this matter, are sufficiently distinct. Mr. *Fearne*, elsewhere than in the remarks above cited, puts the case of a contingency dependant on survivorship, as the same uncertainty as that of an heir apparent or an heir presumptive ; and whether it be the survivor of

ALBANY,
Dec. 1834.

Jackson
v.
Waldron.

one of two, or one of twenty, seems to make no difference, in respect to the character of the possibility, as it certainly should not, if the principle is regarded as purely technical. Mr. *Preston*, a writer also of acknowledged authority, notwithstanding his works have been justly censured for diffuseness and want of perspicuity, states the principle distinctly, in his treatise on estates, that a mere naked possibility is, where the person in whose favor the contingency may arise is not fixed and ascertained, as to children who shall be living at the death of their surviving parent, children who shall attain 21, or to the survivor of several persons. Again, in his treatise on abstracts, page 95, he says, "A gift to the survivor of several persons, or a gift to persons not ascertainable, as children who may attain 21, is a mere possibility ;" and at pages 204, 5, speaking of mere possibilities, "of this description is the expectancies of an heir apparent, or heir presumptive, or of persons when the gift is to the survivor of them." *Jicklings*, in his analogy of legal and equitable estates, page 274, says, "There is a distinction at law between a near and remote possibility—a distinction which, being purely metaphysical, is not admitted into equity ; and there is a distinction in equity though not at law, between a bare possibility and a possibility coupled with an interest; of these the former is regarded in equity alone ; the latter, under certain restrictions, is now regarded both at law and equity." Although there is an inexactness, amounting almost to an incongruity, in the foregoing remark of the writer, arising probably from his not taking into view at the time, the extent to which courts of law have gone recently to sustain possibilities coupled with an interest, yet it otherwise clearly appears, that the idea that a bare possibility is releasable, or in any way transmissible, is not entertained by him, for his assertion that such a possibility is regarded in equity alone, excludes it from being the subject of any legal conveyance whatever ; and at page 274 he illustrates the question of contingent interests which are not devisable because they are not releasable, with the following : "A gift to the survivor of several persons, or to such children of A. as should be living at his death." Chancellor Kent, 4 *Kent's*

*Comm.* 260, says : " If the person be not ascertained, they are not then possibilities coupled with an interest."

Being thus compelled, I may say, by the whole current of authorities, to conclude, that a right such as Medcef Eden the younger had in the premises during his brother's life was only a mere naked possibility, inasmuch as the devise to him was wholly dependent for direction on survivorship—the remaining inquiry is, whether such a possibility was in any form transmissible. This inquiry is already pretty fully answered by the authorities which have been cited. It would seem a necessary consequence, that if Medcef Eden had no interest in the estate, and a mere naked possibility is in law no interest, then there was nothing which could pass by his release, *ex nihilo nil fit.* But on this point, a few words beyond the authorities already referred to, may perhaps be profitably added. It always has been the policy of this country, and for many years has been the policy of the country from which the principles of our law are derived, to relax as fast as possible the feudal restrictions to the alienation of real estate, and expecially has this relaxation been manifested in regard to releases tending to confirm and quiet the estate of the tenant in possession. The rule seems to be now admitted, that every interest or estate in lands may be released to the terre-tenant, though it might not be grantable to a stranger. Thus, if a man grants a limited fee, the possibility of reverter on the determination of the limited fee continues in him, but he cannot make a valid grant of it to a stranger, though it is a possibility coupled with an interest, he however can release it to the owner of the present fee, and it seems to be the amount of the decisions in *Matthew Manning's case.* 8 *Coke,* 187, and *Lampett's case,* 10 *id.* 46, that a possibility coupled with an interest is not assignable, though it be releasable. The sixth of what Lord Coke calls the " *septem quæstiones vexatas et spinosas* produced by the case of a devise of a lease for years to one for life, and after his death to another during the residue of the term, was whether the executory interest might be granted to a stranger, during the life of the first devisee, and it was resolved it could not : first in *Carter's case,* cited in *Fulwood's case,* 4 *R.,* and again in *Lampett's case.*" This rule

ALBANY,
Dec. 1834.

Jackson
v.
Waldron.

seems never to have been varied, and under it a possibility though coupled with an interest, was for a long time held not to be devisable, though it was of course descendible. But in *Roe*. v. *Griffin*, 1 *W. Black*. 606, the court of king's bench decided that all interests which were descendible were devisable. Lord Mansfield said, that "descendible and devisable are convertible terms," and Buller, J., "if the interest be descendible, it is also devisable ; they must be governed by the same principle." But neither this case nor that of *Jones* and *Roe*, 1 *H. Black*. 30. and 3 *T. R.* 88, where the same principle is fully maintained, trench at all on the old doctrine in *Lampett's case*, that a contingent interest is not assignable. Much less do they impeach, but on the contrary, by implication strongly affirm the principle that a mere naked possibility is neither descendible, devisable, assignable nor releasable ; and to this last principle, thet a mere possibility is not a right *being* but an abstraction too remote and uncertain for any form of conveyance to reach, may be added as authorities, 18 *Viner*, *tit. Release, G. ; Shep. Touch.* 321, 2 ; *Bac. tit. Release, H.* ; 1 *Coke*, 111 ; 10 *id.* 2 ; *Preston's Abst.* 204, 5 ; 4 *Kent's Comm.* 262.

If I could have any doubt that Medcef Eden the younger had more than a bare possibility at the time of his assignment to Winter, that is, that he had, as is claimed by the plaintiff, a possibility coupled with an interest, it would become important to settle the question, whether Winter stood in the character of tenant of the freehold, or was a mere stranger, when he took the release ; for if the latter, I am satisfied he took nothing from Medcef, though his (M.'s) possibility was coupled with an interest. I incline to the opinion, if Joseph remained tenant of the freehold at the time of release given, that notwithstanding the execution by him and Medcef was contemporaneous, the law, without greater violence to truth than it frequently allows, might construe Joseph's assignment so far to antecede Medcef's, that the latter would find Winter already invested with Joseph's estate. But if Joseph himself was out of possession when the release was executed, there can be no doubt that Winter took nothing from Medcef. This fact depends principally on the question whether Joseph's

assignment under the insolvent law is completely proved in the case. But this is a point I have not examined, partly because the counsel on both sides seem disposed not to regard it as one of controlling importance, but principally because the authorities compel me to decide that Medcef's possibility was no more releasable than it was assignable, and consequently whether Winter was tenant of the freehold, or a mere stranger, is immaterial to the decision of this case. I am for affirming the judgment of the supreme court.

*ALBANY,*
*Dec. 1834.*

Jackson
v.
Waldron.

After the reading of the opinions of the CHANCELLOR and of Mr. Senator TRACY, the following resolution was submitted to the court :

"Resolved, that the *proof of the hand-writing of Medcef Eden* to the assignment of the mortgage received on the trial of the cause was properly admitted.". Upon which the court divided as follows :

*In the affirmative*—CHANCELLOR, and Senators GANSEVOORT, MAC DONALD, M'DOWELL, MACK, QUACKENBOSS, SEWARD—7.

*In the negative*—Senators ARMSTRONG, CARY, CONKLIN, CROPSEY, DODGE, EDWARDS, FISK, GRIFFIN, HUBBARD, LYNDE, MAISON, TRACY, WESTCOTT—13.

The question was then put, *Shall the judgment of the supreme court be reversed on the remaining points ?* Upon which the court divided as follows :

*In the affirmative*—The CHANCELLOR, and Senators GANSEVOORT, MAC DONALD, M'DOWELL, MACK, QUACKENBOSS—6.

*In the negative*—Senators ARMSTRONG, CARY, CONKLIN, GROPSEY, EDWARDS, FISK, GRIFFIN, HUBBARD, LYNDE, MAISON, SEWARD, TRACY, WESTCOTT—13.

Whereupon the judgment of the supreme court was *affirmed.*