The Chancellor.
The learned judge who delivered the opinion of the supreme court in this case was under an entire mistake in supposing -that it was wholly immaterial whether the will of Arnout Webbers was proved or not. It is evident from the testimony that A. Webbers must have died before the act .of the 12th of July, 1782, abolishing the law of primogeniture. (3 R. S. 1st ed. App. 47.) It is true, the will in question was not proved before the judge of probates' as a will of personal estate until the year after the evacuation of New-York. But *484 the testimony of Mrs. Romaine, who is the only witness that speaks of the time of the death of A. Webbers, shows that he must have died previous to 1781. She says she went to the country before the British took possession of the city in 1776, and returned in about four years, and that her grandfather was then dead. If the will is not proved, therefore, the title of the decedent, if he had any, is in the heirs of Oliver Webbers, the eldest son; unless the latter conveyed his interest in the premises to his brother Philip, who, it is alleged, occupied them after the death of his father.
The will could not be received in evidence after thirty years without proof, as the possession had never been in accordance with the will. The will gave the premises to the widow of the testator during her widowhood; and yet there is not a particle of evidence of her occupation of the premises, or that she survived her husband. If she died before him, then the possession, to be in accordance with the will, should have been in Oliver, Philip, John, Hilah, Sarah, Letty and Hannah, his children, and in Grace Stilwell, his granddaughter, or in those who claimed under them. But the testimony is that Philip alone,'of all the children of the testator or their descendants, was ever in possession of the premises; even if the witnesses are not under a mistake in supposing he was in possession. It is true, Philip and a portion of the descendants of the testator, but not as Mr. Justice Co wen supposed, all the representatives of the devisees except John, gave a quit claim of their interest in the premises to Bake-well and Kinder in 1807. But there is nothing to show whether they claimed the premises as the devisees of Arnout Webbers, or as the devisees or grantees of his son Oliver who was his heir at law. Sarah Reton is also one of the parties to that deed; but there is no evidence that she was one of the devisees, or the representative of a devisee, or that she claimed under the devise. A possession taken under that deed, therefore, and held for thirty years, would not have been a possession in accordance with the will, so as to entitle the deed to be read in evidence to show that some other person was a tenant in common with the grantors. On the contrary, if the grantees *485 had not been in the previous possession of the premises, and had taken possession under that deed for the first time, as the deed did not profess to convey an undivided portion of the premises, that would have been sufficient color of title to the entire lot to enable the grantees to set up an adverse possession as against the whole world. (Cullen v. Motzer, 13 Serg. & Rawle’s R. 356; Clapp v. Bromagham, 9 Cowen's Rep. 530.)
Although from the lapse of time it may be presumed that all the subscribing witnesses to the will were dead, the length of time was not so great as to raise a presumption that there were no persons now in existence who were acquainted with the hand-writing of such subscribing witnesses;(a) and no inquiry appears to have béen made on that subject. In the case of Jackson v. Waldron, (13 Wend. Rep. 178,) this court decided that, before secondary evidence could be given of the execution of a sealed instrument, the party who wished to establish its execution must not only prove that diligent search had been made for the subscribing witness, but also diligent search for those who would be likely to be acquainted with the handwriting of such subscribing witness.. They also decided that a lapse of twenty-five years was not sufficient to raise a presumption that the hand-writing of an obscure female, who had not been heard of for that length of time, could not be proved. In the case of a will of lands it is still more important that diligent inquiry should be made for persons who were acquainted with the hand-writing of the subscribing witnesses. For the proof of the signature of the testator, or even of the hand-writing of one of the subscribing witnesses, does not establish the fact that the will was attested by the other witnesses in the presence of the testator, or that their names to the will were put there by themselves. If due inquiry had been made in this case for persons who were acquainted with G. Furman and his signature, and no such persons could be found, I am not prepared to say that the proof of the will before the judge of probates, by. one of the .witnesses, would not have been good secondary evidence *486 from which its due execution in the presence .of the three .attesting witnesses might be presumed. To render it valid as a will of personal estate, and to admit it to probate as such, it wa.s only-necessary to establish the fact that it was executed by the testator, and no subscribing witnesses were necessary. It was properly admitted to probate, therefore, although the witness who was examined had no recollection of its being witnessed by the scrivener who drew it, and though his testimony left .it somewhat doubtful whether the witness meant to swear that there was another Oliver Webbers besides himself, and that he had pot afiixed-his own signature twice. But to render it valid as a will of real estate, it was necessary, as the law then stood, that it should have been executed in the presence of and attested by three several persons. I think, therefore, the judge erred in admitting the will in evidence without some further proof as tp who the subscribing witnesses were, when they died, and whether their hand-writing was known by aged persons who had been acquainted with them. Where no claim has been made under an alleged will of real estate' for more than fifty years, something more than a mere conjecture that it was probably executed and attested by three witnesses, should be required to admit it in evidence to disturb the possession of those who have held the premises for a period sufficiently long to bar a writ of right.
But even if this will was properly received in evidence, the judge who tried the cause was clearly wrong in his instructions to the jury; which instructions evidently misled the jury in relation to the law of the case. He 'also erred in refusing to charge the jury, as he was requested to do, upon some of the questions of law propounded by the defendant’s counsel, The evidence showed that Medcef Eden the elder was in possession of and claimed the premises at the time of his death, and that he devised the same specifically to his son Medcef Eden the younger in fee, in 1798, when he died. It also appeared that this devisee exercised acts of ownership over the premises after the death of his father, until they were sold under execution against the devisee in July, 1801. The judgment upon which *487 that sale was made was for a large amount, and was recovered or docketed in October, 1800, two years after the death of the father ; and the sheriff’s deed recited that Medcef Eden the younger, the devisee, was seized in fee of the premises on the day of docketing the judgment, and that the purchasers at the sheriff’s sale bid $2275 for the premises, which for aught that appears was then the full value thereof.. Upon this state of facts the judge instructed the jury, in substance, that the fact that the sheriff’s sale was made so soon after the death of Medcef Eden the elder, was important evidence to show that he had no title to the premises.- The effect of this misdirection was to induce the jury to suppose that the devise of the premises to Medcef Eden the younger, his entry under such devise, the subsequent sale of the premises on the execution against him, the recitals in the sheriff’s deed, and the amount of the bid, were not sufficient to authorize the purchasers at the sheriff’s sale to suppose they acquired a good title to the premises by virtue of their purchase, so as to constitute their entry and possession, under the sheriff’s deed in 1801, a good adverse possession against the" whole world. On the contrary, I think the judge should have charged the jury directly the reverse, and should have instructed them, as requested by the counsel of Wright, that the purchase by and the sheriff’s deed to Sharp and Barlow, and the entry by them, claiming under such purchase and deed, were such notorious acts as to constitute an adverse possession.
The charge was also erroneous in instructing the jury that the subsequent deeds being merely quit claim deeds, no inference could be drawn from them that the defendant or his grantors claimed an absolute right. The judge seems to have entirely overlooked the fact that the consideration paid by Kinder and Bakewell for the premises, to Sharp and to the executor of Barlow, was $7900; the consideration in the deed from each being the one half of that amount. He also must have overlooked the fact that on none of the conveyances, subsequent to the Sheriff’s sale, under which the premises devised to Medcef Eden the younger were claimed, was there any deed executed in which it *488 was usual for the grantors to insert covenants of warranty, with the single exception of the deed of Sharp, who owned but half of the premises. And the fact that he sold his interest in the premises at the same time and for the same amount as the executors of his copartner Barlow, who could not be required to convey with warranty, might reasonably account for the omission to insert such a covenant in his deed.
Besides, although the will of Medcef Eden the elder, which was given in evidence, is not set out at length in the bill of exceptions, we know from the published reports in other suits, that the devise to his two sons of separate portions of his estate in severalty contained a contingent limitation over to the survivor in case the one who should die first left no issue. And that of itself was a sufficient reason why the purchasers at the sheriff’s sale should not warrant the title, before it was ascertained whether the devisee of this property would or would not die without issue in the lifetime of his brother Joseph Eden. There was nothing then in any of the deeds through which the defendants claimed title under the devisee of Medcef Eden the elder, to create a doubt in the mind of any one who was a party to such deeds that he was the owner of the premises in fee at the time of his death; as they had the right to presume from the fact that he died in possession, and from the language of his will. To constitute an adverse possession of land, an entry under color of claim of title is sufficient; and it is wholly immaterial whether the title afterwards turns out to be valid or invalid. Nor is it material whether the conveyance under which the entry is made does or does not contain covenants of warranty. Where the sheriff, therefore, sells lands upon execution, of which land the judgment debtor is in possession claiming under a devise in fee, and the purchaser takes possession under the. sheriff’s deed and continues in possession for more than twenty years, by himself or his grantees, and there is nothing in the circumstances to induce a belief that the purchaser at such sale knew the judgment debtor had no title, the legal inference is that the possession is adverse to the whole world. And unless something afterwards occurs to change the adverse character of the *489 possession, the right of the real owner is barred. And the result will be the same where the entry is under color of a conveyance from the sheriff, although such conveyance is not upon its face sufficient to convey the legal title to the land. (Jackson v. Newton, 18 John. Rep. 355.) And the fact that the purchaser from the sheriff is afterwards induced to doubt the validity of his title under the sheriff’s sale, where he. continues in possession under the same, will not destroy the adverse character of that possession.
If the entry under the sheriff’s deed in 1801 was adverse to the title now set up under the alleged conveyance from John Webbers, there was no evidence in this case which could justify a presumption that the claim of title derived under the will of Medcef Eden the elder, and under the judgment against his devisee, was ever abandoned by the purchasers at the sheriff’s sale, or those who had derived title to the premises under them, although no deeds with warranty of title have been given. A quit claim deed, or deed without covenants, is just as valid and effectual to transfer the title to the land as a deed with full covenants. And where a grantor is in possession claiming to be the owner of the premises under color of a valid conveyance to him in fee, the fact that he conveys by a deed without warranty is not sufficient to create a suspicion that either he or his grantee intends to abandon the former adverse claim, or to admit that any other person is the owner of the premises or any part thereof. The case is different where the grantor in such a deed is in possession as a mere squatter, and not under any claim or color of title to the premises, and where the consideration in the deed is wholly disproportioned to the actual value of the premises at the time. Under such circumstances the jury may reasonably conclude, in the absence of any proof to induce a contrary belief, that the quit claim deed was only intended to transfer the temporary occupancy of the. premises. But in this case there is not a particle of proof that the $7900 mentioned as the consideration of the two deeds of July, 1805, or even the half of that sum, was not the full value of the base or determinable fee in the ten acres devised to Medcef Eden the *490 younger, even if there was no possible doubt of the title of the devisor, encumbered as that title probably was with the inchoate right of dower of the wife of the devisee.
Nor was the taking of the quit claim deed from some of the descendants of Arnout Webbers in 1807, by Kinder and Bake-well, any evidence that they intended to abandon their claim of title under the sheriff’s deed, and to admit themselves in possession as tenants in common with all the other descendants of Arnout Webbers, or those who might claim title under him. A party in possession of land claiming it as his own, under color of title in fee, must be permitted to quiet such title by obtaining a conveyance of an adverse claim in a stranger, without destroying his previous claim of title as against other persons who do not claim under or through such stranger, and of whose pretended claim the person in possession never heard. Here there is not a particle of proof that Kinder and Bakewell ever admitted or supposed that John Webbers, or his grantee, ever had or claimed any interest in the premises, as tenant in common with any of the grantors in the quit claim deed, or otherwise; or that even the grantors themselves had in fact any valid title to the premises. And the small consideration expressed in that quit claim, as compared with the price which the grantees had paid for the premises two years before, is pretty Conclusive evidence that the grantors themselves had very little faith in their pretended claim of title to the premises, whether they Claimed as heirs at law of Arnout Webbers or otherwise. The probability is that Kinder and Bakewell, not having possession of any of the papers of Medcef Eden the elder, which as purchasers under a sheriff’s sale are not presumed to have come to their hands or to the hands of their grantors, and not fihding the conveyance under which he claimed title to the premises, and learning that Arnout Webbers had once been in possession, and that these grantors claimed some interest in the premises under him or his heir at law, thought it well to pay this small sum to prevent the necessity of litigating that claim, without knowing whether there was any means of defending themselves against such a claim. Taking that convey *491 anee, therefore, which did not profess to quit claim the interest of the grantors in an undivided portion of the premises merely, but in the whole land, did not destroy the adverse'character of the possession of the grantees in such conveyance, in the premises, as against other persons, of whose claims as tenants in common xvith the grantors they may never have heard. And if this case had. been submitted to the jury under a proper explanation of the law of the case, as requested by the defendant’s counsel, instead of the misdirections in point of laxv which I have noticed, I think there can be no doubt that the jury would have found that the possession had been taken and held under the sheriff’s deed and the other conveyances given in evidence by the defendant, for more than txventy-five years, previous to the commencement of this suit in 1834, adverse to the claim now made by the plaintiff under the alleged deed of John Webbers. .That claim appears to have slumbered from 1784, until the trespass committed upon the possession of Wright in 1830; nearly half of a century. And no good reason is shown why it was not set up before, if the grantor in the alleged deed or his heirs supposed they had in fact any interest in the premises. Joel Northrop, the grantee, lived from twenty-three to twenty-eight years after the date of the deed; and more than half of that time after Medcef Eden the elder took possession of the premises, claiming to have purchased them of some one, according to the testimony of Mr. Targee and others. And there is nothing in the evidence to show that J. Northrop’s children were not in a situation to assert their rights, if they had any under that deed, at the time of his death. It is not a case, therefore, in xvhich the law of adverse possession, xvhich xvas enacted to protect bona fide holders of real estate against such antiquated claims, after all those xvho could have testified to the real facts of the case were in their graves, and the evidences of titles may have been lost, should be made to bend in favor of a dormant claimant.
I think the objection that the certificate of the judge before whom the deed from John Webbers to Northrop was acknoxvledged, did not state that he knew or had proof of the identity *492 of the grantor, was not well taken. By the 22d section of the chapter of the revised statutes relating to the proof and recording of conveyances &c., (1 R. S. 760,) every conveyance of real éstate which had been executed and acknowledged, or proved, and certified in such manner as to entitle it to be read in evidence, or recorded, by the laws which were in force when that chapter went into effect, but which had not then been recorded, may still be recorded, or read in evidence, in the same manner and with the like effect as before. And by the 7th section of the act of 1813 concerning deeds, (1 R. L. of 1813, p. 369,) as that section was amended by the act of the 4th of February, 1814, all deeds which had been duly acknowledged previous to April, 1801, agreeably to any law of the state in force at the time of making such acknowledgment or proof, were entitled to be recorded or read in evidence; except deeds of military bounty lands executed on or before the first of May, 1797. And under the laws which were in force previous to the act of February, 1797, relative to the acknowledgment of deeds, it was not necessary for the officer who took the proof or acknowledgment to state in his certificate that he knew the person making the acknowledgment, or had proof of his identity. Whether there was any law in force in 1784 authorizing a judge1 of the supreme court of another state to take the proof or acknowledgment of a deed of lands in this state, except the 5th section of the act of the 16th of February, 1771, (2 Van Schaack's Laws, 612,) I have not been able to ascertain. But no objection was taken upon the trial that there was no evidence of the fact that the grantor lived in Connecticut, or that the certificate of acknowledgment was not authenticated in the manner required by such 5th section. If the attention of the court or the counsel had been called to these specific objections, the plaintiff might perhaps have obviated them by proving the hand-writing of the grantor and of one or both of the subscribing witnesses to the. deed. My impression also is that the counsel for the plaintiff in error abandoned the objection to the proof of this deed upon the argument here. . It is not necessary therefore to inquire whether the fact that the supposed grantor had mistaken entirely the *493 name of one of his sisters, as well as the terms of the will under which the plaintiff claimed, called for any further proof on the partof the latter respecting the identity of the grantor in that deed, as the son of Arnout Webbers. If the decision of a bare majority of the members of this court in reversing the decision of the supreme court in the case of Brown v. Kimball, (25 Wend. Rep. 259,) is to be considered as settling the law beyond the particular facts in that case, which in my opinion it does not, the circumstances to which I have alluded might cast sufficient suspicion upon this deed to call for further proof of the identity of the grantor in'the deed to Joel Northrop. I think however that the circumstances alluded to, in connection with the fact that the certificate of acknowledgment contains no evidence of the identity of the grantor, and that the grantor is not described in the deed as the son of Arnout Webbers, or as the John Webbers who was one of the devisees in the will, were all matters of fact for the consideration of the jury in deciding whether the grantor in this deed was the son of Arnout Webbers, and the brother of Letty, one of the daughters of the testator, whose name is called Anna in the deed of 1784. And there is nothing in this case to show that the counsel for the defendant Wright were not allowed the full benefit of all these circumstances of suspicion upon the argument of his cause before the jury.
But, for the errors in law of the judge in receiving the will in evidence, without sufficient proof of the hand-writing of all three of the witnesses thereto, or proof that no persons, upon diligent search, could be found who were acquainted with the handwriting of G. Furman, and in misdirecting the jury in his charge, as well as in refusing to instruct them in matters of law which were proper for their consideration, when requested to do so by the counsel of the defendant, I think the judgment of the court below was erroneous, and that it should be reversed; and that a venire de novo should be awarded.
Bockee, Senator.
The judge’s charge seems to determine the question of adverse possession from circumstances and upon evidence which appear to me very far from being conclusive, *494 and a jury might well and rationally have drawn inferences and come to conclusions different from those of the learned judge who presided at the trial. It is stated in the judge’s charge that the title of the plaintiff in error commenced under very suspicious circumstances in Medcef Eden. I am unable to discover from any facts appearing in this case that any circumstances of suspicion attended the commencement of the possession of the elder Eden. All that we learn from the case is, that Arnout Webbers first held the possession, and that afterwards Medcef Eden appeared in possession. The judge mentions only one circumstance of suspicion to show that the elder Eden had no title, viz. that the sale by virtue of the judgment and execution against the younger Eden took place so soon after the death of his ancestor. The elder Eden died in 1798, having specifically devised the premises in dispute to his son Medcef. In 1801, the sheriff of the city and county of New-York, by virtue of an execution against Medcef Eden the younger, sold these premises to those i from whom the plaintiff in error derives his title. Three years only intervened between the death of the elder Eden and the sale by virtue of the execution against his devisee. This circumstance was pressed upon the consideration of the jury as of great importance to show that Eden had no deed. It does not strike my mind as having the weight of a feather in the scale. That large estates should be speedily dissipated by spendthrift heirs, is not so uritisual or extraordinary in this age and country as to create surprise or raise any presumption unfavorable to the validity of the title of the ancestor. I should think that the-defendant in this ejectment ought to stand precisely in the position where Medcef Eden would have stood if the sheriff’s sale had never taken place, and it must be perfectly immaterial whether such sale was made within three years, or after the lapse of fifty years, from the death of the ancestor. It is the same title which is now held by the grantees of Eden.
Neither can the circumstance that the premises were conveyed to the plaintiff in error by successive quit claim deeds, have any important bearing upon this question, when we advert to the fact that the grantors in every instance, except that of the con *495 veyance of one half of the premises from Sharp to Kinder and Bakewell, were acting in a representative character, either as public officers, or executors or assignees in trust. It would have been more strange if they had given deeds with full covenants of warranty.
It is claimed on the part of the defendant in error that the Collard deed, given in 1807, to Kinder and Bakewell, established a tenancy in common, and such appears to be the opinion of the supreme court, as delivered by Mr. Justice Cowen. There is nothing in that deed tending to show the existence or to create the relation of tenants in common between these parties. For aught which appears in that deed, the grantors might have claimed title under the elder Eden, instead of Arnout Webbers. The grantees, Kinder and Bakewell, being in possession under a sale by virtue of a judgment and execution against Medcef Eden, cannot in my opinion be considered as abandoning that title because they chose to quiet their possession by purchasing the claim of Collard and others. I apprehend it is a very forced and unwarranted construction that they thereby acknowledged the title of the heirs of Arnout Webbers, or made themselves tenants in common with the plaintiffs in this suit. In.1801, these premises were sold by the sheriff of New-York to the grantees of the defendants for the consideration of $2275. In 1807, at which time we may reasonably presume that property located as this was may have very greatly appreciated, the same premises were conveyed by Collard and others by quit claim deed for the consideration of $700. ' And yet we are required to believe that the Collard deed .conveyed the good title, and the sheriff’s deed the bad one. The amount of the consideration does not indeed affect the validity of the title; but it is a circumstance 'tending to explain the views and intentions of the parties, and affords a reasonable presumption that Kinder and Bakewell did not intend to abandon the title under which they held, and adopt that of Collard and others. There is no evidence that the defendants.in the court below ever claimed under the Collard deed, or recognized the plaintiffs as their co-tenants.
This cause seems to turn upon the question of adverse posses *496 sion. And such possession has doubtless existed for a sufficient period of time to bar the plaintiffs’ right of recovery, unless it is made out that the parties are tenants in common. I think it cannot be believed that the fact of tenancy in common is established with sufficient clearness of evidence to justify the court in withholding the question from the consideration of the jury. It is not the necessary, and perhaps not the rational inference, that' the defendant below, by accepting the deed from Col lard and others, intended to acknowledge the validity of their title, and make himself a tenant in common with the plaintiff. The case, however, does not show that the defendant, or Kinder and Bake-well, ever accepted such deed, or that it ever was in their possession, or that they ever knew or acknowledged its existence; still less that they claimed title under it. How could they then, without any act on their part, be made tenants in common with the plaintiff? It is easy to see that the rule of law as expounded by the court below would operate very mischievously. No man would ever dare to purchase in any outstanding claim, for fear of identifying himself with a bad title, and thereby losing his estate.
The exception to the judge’s charge that the jury were misdirected as to the inferences and conclusions to be drawn from .the testimony is well taken. Neither the quit claim deeds under which the defendant held, nor the Collard deed under which he did not hold, would show that a possession otherwise adverse was held in common with the plaintiffs. A new trial should be granted.
Senator Lott also delivered an opinion in favor of reversing the judgment of the supreme court, on the ground, among other's, that the charge of the circuit judge tended to mislead the jury on the question of adverse possession.
Senators Barlow and Hard delivered opinions in favor of affirming the judgment of the supreme court.
*497 On the question being put, “ Shall this judgment be reversed ?” the members of the court voted as follows:
For reversal: The Chancellor, and Setiafors Bartlit, Bockee, Burnham, Chamberlin, Denniston, Jones, Lawrence, Lott, Mitchell, Porter, Scott, Scovil, Smith, Varney and Wright&emdash;16.
For afirmance: Senators BACKUS, BARLOW, HARD and W0RKs-4.
Judgment reversed.

 But see Cowen & Hill's Notes to Phill. Ev. 1316, and the cases there cited.