DEN EX DEM. HENRY HOLCOMB v. FEN, OTANIEL LAKE, TENANT IN POSSESSION.

1. Devise to John H. and his heirs, (that is, the issue of his body lawfully begotten, being either male or female,) forever, created an estate tail under the statute *de donis*, the will being dated in 1783, and the testator having died before the act of August, 1784.

2. The subsequent clause, in case John die before twenty-one, or without issue, then the estate to be equally divided among my surviving children, created an estate in remainder in such surviving children.

3. The word *or* in a devise will not be changed to *and* unless it becomes necessary to effectuate the intention of the testator.

4. The words surviving children as here used, mean the testator's children surviving at the death of John, the person whose death casts the descent upon them.

5. The words of the will must govern, unless there are clear indications of a contrary meaning to be found in the instrument itself, taking it all together.

6. The estate devised over was a contingent remainder which could only vest in interest in the daughters in the event that John died without issue, and in possession, in the event of both or one of them surviving him.

7. As the daughters both died before John, the estate never vested in them, or either of them. All they ever had was a mere possibility; on their death the estate in remainder became extinct.

8. After the death of the daughters, the estate left was an estate in reversion in the heirs of the original devisor, Richard Holcomb, to commence in possession after the determination of the estate tail in John.

9. As a general rule, whenever a greater estate and a less meet in one and the same person, without any intermediate estate, the less immediately merges in the greater. But an estate tail is an exception to the rule.

10. The contingent fee descended at the death of Richard to his heirs, according to the law of descent existing at the time of his death; that is, the descent was under the act of 1780—one-half to John, and one-fourth to each of the daughters.

Richard Holcomb departed this life in January, 1784, having first made and published his last will and testament, in which, among other things, he devised and bequeathed as follows:

"ITEM.—I give and bequeath unto my son *John Holcomb*, (being my only son,) *my two homestead plantations*—that is, that on which I dwell, and that on which Abraham Pitten-

ger liveth—with the premises and appurtenances thereunto belonging or in any wise appertaining, as they are butted and described, and contains, as by the respective deeds, bequeathed me by my father, as by his last will, dated the 17th day of the 6th month, A. D. 1743, *to him, the said John Holcomb, and his heirs,* (that is, *the issue of his body lawfully begotten,* being either male or female,) *forever,* to have possession of the above mentioned premises when he arrives at the mature age of twenty-one years; also my clock and writing desk, and a two year old Snap-colt, and the sum of sixty pounds current money of the state aforesaid, to be paid to him at the age of twenty-one years aforesaid. And in case my said son *John Holcomb die before he comes and arrives at the said age of twenty-one years, or without issue heirs of body lawfully begotten,* that *then* my will is, that the said two plantations, the said sum of sixty pounds, clock, writing-desk, and two year old colt, being the legacy of my said son, be *equally divided amongst my surviving children,* in manner and form my executors shall judge most proper and advantageous."

The testator left, at the time of his decease, three children —his son *John Holcomb,* then about sixteen years of age, and two daughters, *Sarah Leach,* and *Mary Holcomb,* both of whom were married, and had issue, at the time the testator made his will.

*Sarah Leach* died in 1826 ; *Mary Holcomb* died in 1835 ; both leaving children and grandchildren. *John Holcomb* died in 1851. He was never married, and of course had no lawful issue ; but in his life-time he made a will, devising the premises in question to his illegitimate children, &c.

The lessee of the plaintiff is one of the children of Mary Holcomb, who was one of the daughters of Richard, the testator.

The tenant in possession claims under the devisees of John Holcomb, deceased.

And by the state of the case it is submitted, that if the court shall be of opinion that the lessor of the plaintiff is entitled to recover, then judgment is to be entered for the

plaintiff; if otherwise, then judgment is to be entered for the defendant, either party to be at liberty to turn this case into a special verdict, and bring a writ of error.

The case was argued by Mr. *Peter I. Clarke* and Mr. *Bradley*, for plaintiff, and by Mr. *William Halsted*, for defendant.

The opinion of the court was delivered by

POTTS, J.    The first question is upon the construction of the will of Richard Holcomb, deceased.    The second, what became of the estate at the death of John.

The devise is to John and his lawful issue, male or female, forever.    This was an *estate tail* under the statute *de donis*, the will being dated in 1783, and the testator having died before the act of August, 1784.    So far there is no dispute.

The subsequent clause—in case John die before twenty-one, *or* without lawful issue, *then* the estate to be equally divided among my *surviving* children, created *an estate in remainder* in such surviving children.    This is not controverted.

Then, was this a *vested* or a *contingent* remainder? and if contingent, what was the contingency? and what became of this remainder?    These are controverted questions.    To determine them, we must first examine the language and ascertain, if we can, the meaning of the testator.

I. The defendant submits, that in the sentence " in case John die before twenty-one, *or* without issue," the word "*and*" should be substituted for "*or*."    But this is never done, unless it becomes necessary in order to carry into effect the clear intention of the testator.    Such were the cases of *Den* v. *Taylor*, 2 *South.* 420 ; *Nevison* v. *Taylor*, 3 *Halsted* 43 ; *Den* v. *English*, 2 *Har.* 280.    Here, I think, that dying *without lawful issue* was the thing the testator had in mind.    He considered that until John arrived at twenty-one, he would not be of mature age ; till then he

was not to have possession of the land ; and he seems not to have supposed it at all probable that he would marry and have issue before that period of his life ; and hence the language, " if he die before he comes and arrives to the said age of twenty-one, *or* without issue," &c. Putting the limitation on the event of not having issue, as well as dying before twenty-one. But this is an immaterial question here.

II. Then the plaintiff's counsel contend that the words " *then* " and " *surviving*," in the clause of limitation, refer to the time of the *testator's* decease, and not to that of *John's* death. They construe the sentence thus : In case John dies before twenty-one or without lawful issue, *then* (in that event) my will is, that the plantations, &c., be equally divided amongst my children who *survive me.* I am not able to see that these words will bear the interpretation thus given to them.

I. Because such is not their natural, obvious meaning— not the meaning they convey to the mind of the ordinary reader. The testator is speaking of an event which may occur at a future period, to wit, *John's death* without lawful issue, and he goes on to say that if that event should happen, *then* his will is, that a certain consequence shall follow—shall follow *then,* upon the happening of *that event,*—and that consequence is, that the lands given to John shall be divided among his *surviving children.* Divided when ? Certainly after John's death. Among his *surviving* children. Surviving when ? Certainly at the *time* of which he is speaking. Surviving who ? Certainly the *person* whose death casts the estate to be divided upon them.

II. It is said this is an *unreasonable* construction, because when the testator made his will both his daughters were married and had children, and that he could not have intended, that if one should die before John the other should take the whole estate, to the exclusion of her deceased sister's children, which would be the effect in such a case of this construction. But the answer to this is, the word " *surviving* " is here in the will, put here by the testator ; he meant something by it, and that something was that such

of his children who survived *somebody* should take, and such as did not survive should not take ; and the very event supposed to be unreasonable might have occurred upon the plaintiff's own construction, for one of the daughters might not have survived the *testator* himself.

III. Again, it is insisted, that from the facts and circumstances which were before the testator's mind when he made his will, and the whole scope and tenor of the devise, it was manifestly his *intention* that the estate should go to his two daughters and their heirs, if John died without issue, and that we should therefore construe the will most favorably to effectuate that intention. And if the counsel's premises are sound I cordially agree to his conclusion. But then there is no rule of higher obligation in the construction of wills than this : that the words of the will must govern, unless there are clear indications of a contrary meaning to be found in the instrument itself, taking it all together. *Ferne on Rem.*, 166 ; *Luxford* v. *Cheeke*, 3 *Levinti*, 125 ; *Brown* v. *Cutter*, *Raymond*, 427 ; *Den* v. *Wortendyke*, 2 *Halsted*, 379. We must take care how we indulge in speculations as to the intention of testators. Our province is not to make wills for testators as we think they ought to be, but to interpret fairly such as they have seen fit to make. And I have not been able to see any clear indication any where in this will that the testator did not intend to do just what he in fact did, according to the plain meaning of the language he has used, to wit, confine his bounty to his living children, irrespective of the issue of any deceased child. From the will itself we have no indication that he had a grandchild in the world.

IV. The course of judicial construction is against the plaintiff. In *Den* v. *Sayre, Penn.*, 598, where land was devised to A., and if he die without lawful issue, *then* to be " equally divided amongst all my *surviving* children," it was resolved that the children *surviving* A. took the land.

So in *Seddell* v. *Wills et al., Spencer*, 223, the testator devised a tract of land to each of his daughters in fee, and then added, " If either of my daughters, before mentioned,

should die without lawful issue, it is my will that the lands devised to such daughter as shall die without lawful issue, shall be equally divided among *my surviving* sons and daughters as aforesaid;" and it was held that the devise over was not to those who were living at the time testator made his will, nor living at his death, but to such as should survive *the one dying without issue. Lessee of Westbrook v. Romeyn, Baldwin's R.,* 196, is much like the present case. There Abraham Van Campen conveyed lands to his son *Moses,* and to the heirs of his body lawfully begotten, or to be begotten; and in default of such issue, *then* to the *surviving* sons and daughters of Abraham in certain shares. And the court said, "the word *then* denotes the time when the interest vests in them to be at his (Moses') death, as well as the persons to take, that is, those who shall then be the survivors of *Moses.*" That "as a general rule, words of survivorship relate to the time or event when the thing devised is to be distributed or enjoyed, and not to the time when the will took effect by the testator's death."

There certainly are decisions to be found conflicting with this doctrine; but the rule, as laid down above, is in accordance with the later authorities. *Powell on Devises,* 738; and that author remarks, on a review of all the cases, that "where the gift to survivors is limited *upon a certain contingency,* none of the reasoning (infirm as that reasoning is) upon which it is held to refer to survivors at the death of the *testator* applies." *Ibid.,* 751.

Then the estate devised over after the particular estate was a *contingent remainder,* which could only vest in *interest* in the daughters in the event that John died without lawful issue, and in *possession,* in the event of both or one of them surviving him.

John died in 1851, without ever having had lawful issue, but the other event never happened. Both of the daughters of the testator *died before John.* They never were in a situation to take; for while they lived the contingency of John's having lawful issue stood in their way. The estate in remainder, therefore, never *vested* in them, or either of

them. It would have been different if the devise to John had been simply for life, and then over to the surviving children of the testator. In that case the estate in remainder would have vested in the daughters in interest, though not in possession, at the testator's death. Remainders are necessarily contingent, as to the enjoyment, during the continuance of the particular estate; but that makes no difficulty, for the distinction between a *vested* and a *contingent* remainder does not depend on the contingency on which it is to vest in *possession*, but on that on which it is to vest in *interest*. In every vested remainder the capacity to take possession arises before the right to take it, and that capacity only exists where there is a person in *esse* who meets the description of the remainder man, and nothing is interposed between him and the possession, except the particular estate. The remainder here was to the survivors of *John, if he died without lawful issue.* So that all the daughters ever had was a mere possibility. *Johnson* v. *Waldron,* 13 *Wendell,* 178.

Then it follows that the estate in remainder became extinct, was lost forever, upon the decease of the two sisters—the one in 1826, the other in 1835.

II. The next question is, what became of the estate after John's death, without having had lawful issue, in 1851?

The lessor of the plaintiff is the son of Mary Holcomb, and one of the heirs of his grandfather, Richard Holcomb.

The defendant claims under, the devisees of John, who by will devised the lands in question.

The particular estate terminated at John's decease. If I may be allowed the expression, *it died with him.* His devisees take nothing from that source.

Then did John take any interest in the estate, as heir of his father Richard, upon the decease of his sisters?

Under the statute *de donis,* lands given to a man and the heirs of his body went to the issue, if there were any, and if none, reverted to the donor. The donee had a fee tail, and the donor the ultimate fee simple of the land, expec-

tant on the failure of issue, which expectant estate was called a *reversion*.

Such was the estate left after the extinction of the remainder by the death of the daughters. It was an estate in reversion in the heirs of the original devisor, Richard Holcomb, to commence in possession after the determination of the estate tail in John. Sir Edward Coke describes a reversion to be the returning of land to the grantor or his heirs after the grant is over. 1 *Institutes*, 142.

Now it is well settled, as a general rule, that "whenever a greater estate and a less coincide and meet in one and the same person, without any intermediate estate, the less is immediately annihilated; or, in the law phrase, is said to be *merged*, that is, sunk or drowned in the greater." 2 *Black. Com.*, 177. But then the particular estate in this case was *an estate tail*, and an estate tail is *an exception to the rule;* for, says the same author, "a man may have in his own right *both an estate tail and a reversion in fee;* and the estate tail, though a less estate, shall not merge in the fee. For estates tail are protected and preserved from merger by the operation and construction, though not by the express words, of the statute *de donis,* which operation and construction have probably arisen upon this consideration: that, in the common cases of merger of estates for life or years, by uniting with the inheritance, the particular tenant hath the sole interest in them, and hath full power, at any time, to defeat, destroy, or surrender them to him that hath the reversion; therefore, when such an estate unites with the reversion in fee, the law considers it in the light of a virtual surrender of the inferior estate. But, in an *estate tail*, the case is otherwise; the tenant, for a long time, had no power at all over it, so as to bar or destroy it, and now can only do it by special modes,—by a fine, a recovery, and the like; it would, therefore, have been strangely improvident to have permitted the tenant in tail, by purchasing the reversion in fee, to merge his particular estate, and defeat the inheritance of his issue; and hence it has become a maxim, that a tenancy in tail, which cannot

be surrendered, cannot, also, be merged in the fee." 2 *Black. Com.*, 178.

The result is, that upon the death of Mary Holcomb, the last surviving daughter of Richard Holcomb, the reversion in fee of the land in question went to the heirs at law of Richard.

But here another question is made, and that is, whether the descent was under the act of 1780, by which the son took two shares and the daughters, each, one share; or under that of 1817, by which sons and daughters take in equal proportions.

The fee was not devised absolutely by Richard, but only on certain contingencies; as first, John's having lawful issue. Second, the daughters, Sarah and Mary, or one of them, surviving John.

The second contingency ceased to exist when the last of the daughters died before John. The contingency of John's having lawful issue terminated afterwards, by his dying without lawful issue.

The question is, what became of this contingent fee at the death of Richard, in 1784? It certainly descended to his heirs, and descended *at his death;* and according to the law of descent existing at the time of his death. The *descent* was under the act of 1780, that is, one-half of the estate to John, one-quarter to the heirs of Sarah Leach, deceased, and one-quarter to the heirs of Mary Holcomb, deceased.

It is true the *heirs* did not become seized of their respective shares, so as to make a *possessio fratris*, because the estate which so descended to them was nothing more than an estate expectant upon a precedent freehold, the feudal seizin being in the tenant in tail. *Watkins on Descents*, 110, 112. But this principle does not affect the question here, which is a mere question as to the *time when* the descent was cast on them by Richard's death. The fact that the estate did not vest in *possession* in the heirs of Richard until after John's death, is admitted; the fact that it did not so vest as to be capable of being transmitted to

Holcomb v. Lake.

the right heirs of those on whom it descended, is admitted; but the descent of the expectant estate was nevertheless cast on them in 1784, by the death of the donor, and the *share* which the heirs took was governed by the law of the *time* of the descent cast, and not by the *quality* or *character* of the estate which they took.

The argument of the counsel of the plaintiff seems based upon the idea that the descent did not *commence* until it became an estate in possession by the termination of the particular estates outstanding. But the answer to this is, that the fee was in Richard, and when he died must have gone somewhere—must have descended to somebody—it did not remain locked up in his grave until the particular estate fell in. Then if the descent commenced at all, that is, if a fee expectant upon the determination of a freehold descends at all while the particular estate is outstanding, *the law of the time when the descent commences* must govern as to this question, no matter when it vests in *possession* in the heirs, and no matter who they are.

If John had died without having disposed of his interest expectant upon the termination of the estate tail, the estate would have gone, not to his heirs, but to the heirs of Richard. *Watkins on Descents*, 119. But John did dispose of this interest by will, and, therefore, this rule has no application here.

The result is, that the heirs of Sarah Leach are entitled to one-fourth of the estate, and the heirs of Mary Holcomb to one other fourth part.

Let judgment be entered accordingly.

AFFIRMED, 1 *Dutch.* 605. CITED *in Moore* v. *Rake*, 2 *Dutch.* 590; *Courter* v. *Stagg*, 12 *C. E. Gr.* 307.